32 Ill. App.3d 1052 (1975)
337 N.E.2d 344
RICARDO MUNOZ, Plaintiff-Appellant,
v.
CIVIL SERVICE COMMISSION OF THE STATE OF ILLINOIS et al., Defendants-Appellees.
No. 60326.
Illinois Appellate Court  First District (1st Division).
October 6, 1975.
Jonathan M. Hyman and Thomas F. Geraghty, of Northwestern Legal Assistance Clinic, of Chicago, for appellant.
Freeman and Tingler, of Chicago (Robert A. Tingler, of counsel), for appellees.
Judgment affirmed.
Mr. JUSTICE SIMON delivered the opinion of the court:
Dr. Ricardo Munoz filed a complaint in the circuit court for judicial review of a decision of the Civil Service Commission (hereinafter referred *1053 to as "the Commission") pursuant to the provisions of the Administrative Review Act (Ill. Rev. Stat. 1973, ch. 110, § 264 et seq.). The circuit court concluded that the findings of the Commission were supported by the manifest weight of the evidence and affirmed the findings and the discharge of the plaintiff from his position with the Department of Mental Health (hereafter referred to as "DMH").
DMH initiated discharge proceedings against Dr. Munoz, an employee at Elgin State Hospital (hereafter referred to as "Elgin"), pursuant to the provisions of the Personnel Code. (Ill. Rev. Stat. 1971, ch. 127, § 63b 101 et seq.) The charges filed fell within three general categories: (1) that Dr. Munoz secured employment with DMH through the use of false and misleading information on his employment application; (2) that he obtained a limited license to practice medicine in State institutions by submitting false and misleading information to the Illinois Department of Registration and Education; and (3) that he did not perform his duties for DMH in a satisfactory manner because of his failure to practice medicine competently and in conformity with accepted medical community standards.
On appeal, Dr. Munoz argues that the evidence proved neither that he failed to practice medicine in conformity with accepted standards nor that he obtained his employment and license through false and misleading representations. In addition, he contends that whether he obtained his limited license to practice medicine by submitting false information to the Department of Registration and Education is a decision to be made only by that Department and not by the Commission. Dr. Munoz also contends that the Commission improperly considered signature exemplars which were not authenticated in concluding that his diploma from the University of Havana Medical School was not genuine.
A review of the evidence relating to misrepresentations and false statements made by Dr. Munoz in applying for employment with DMH and in obtaining his limited license to practice medicine in State institutions reveals the following:
Dr. Kenneth Schnepp testified that he was the chairman of the Medical Examining Committee of the Department of Registration and Education. Dr. Munoz applied for a license in 1967, furnishing a letter of recommendation from Dr. Kearns, the director of the clinical laboratory at St. Elizabeth's Hospital in Chicago, stating that Dr. Munoz was a supervisor of medical technicians in the pathology lab at St. Elizabeth's Hospital in Chicago for 4 years and that he took a post-graduate course in general medicine there from March 1966 to June 1966. On the basis of the information provided, Dr. Munoz was given a license to practice medicine limited to State institutions. He passed an exam given by the Department *1054 of Personnel for the position of resident graduate physician and was subsequently employed by DMH.
Dr. Schnepp also testified that the records of the Department of Registration and Education indicated that a diploma allegedly issued to Dr. Munoz by the University of Havana School of Medicine in 1958 was verified by Jack Hayes, the superintendent of registration, on July 8, 1966. Dr. Schnepp visited the medical school for 2 days in 1958, and knew that it was closed at that time because of the revolution. Ms. Marcum, a licensing supervisor for the Department of Registration and Education, testified that personal verification of plaintiff's diploma by the superintendent of registration would be an unusual procedure. Ms. Klassen, another employee of the Department, testified that Mr. Hayes told her he had verified the diploma and she, therefore, noted in her handwriting on Dr. Munoz' application that the diploma was verified and signed Mr. Hayes' name. She testified, however, that it was unusual for the superintendent of registration to verify diplomas and that although she or the medical examining board ordinarily reviewed diplomas, Dr. Munoz' diploma was never presented to them.
On his application to the Department of Registration and Education, Dr. Munoz indicated that he had served a "rotating internship * * * at University Hospital from 1958 to 1960 (2 years)"; on an employment application to the Department of Personnel, he gave the same information. DMH introduced employment records showing that Dr. Munoz was employed in Mexico from January 1, 1959, to May 9, 1959, during the time he claimed to have served this internship.
On his employment application to DMH, Dr. Munoz stated that he was the "Head of Lab" at Ridgeway Hospital from 1962 to 1963, and acted in a supervisory capacity. He also responded that he had been "Chief of Lab" at the Board of Health from 1966 to 1968 and at St. Elizabeth's Hospital for 4 years from 1962 to 1966 under Dr. Kearns, also acting in a supervisory capacity in the latter position.[1] Henry Disteldorst, an administrator at Ridgeway Hospital, testified that Ricardo Munoz had been employed as a laboratory technician from 1962 to 1963, that he was the only employee in the laboratory and he ran only routine tests. Gerald Sullivan testified that he was an administrator at the Board of Health. He testified that Dr. Munoz worked there only as a chemist under the supervision of the lab director.
Sister Mary Bertram, administrator for St. Elizabeth's Hospital, testified that Ricardo Munoz was employed as a lab technician between 1962 and *1055 1966. At no time was he employed in the capacity of a doctor. During Dr. Munoz' employment there, Dr. Kearns was chief of the lab, not Dr. Munoz. A chief technician, a position held by Sister Gerald, was under Dr. Kearns. Then assisting Sister Gerald were the lab technicians, and Dr. Munoz was one of them. In 1971, Dr. Munoz approached Sister Bertram and requested a letter of recommendation stating that he had completed an internship in pathology at St. Elizabeth's Hospital. Sister Bertram refused because there was no approved internship program at the hospital. He then asked Sister Bertram at least to state that he had worked in the pathology department and that whether this qualified as an internship would be for the Department of Registration and Education to decide. Dr. Munoz claimed that he had completed a post-graduate course, but Sister Bertram testified that there was only an in-service program for doctors at St. Elizabeth's to keep them abreast of developments in their fields. At the hearing Dr. Munoz produced the letter of recommendation referred to by Dr. Schnepp which Dr. Munoz claimed was written by Dr. Kearns. Sister Bertram testified that the usual practice at the hospital would be to place a copy of any letter of recommendation of that type in the person's personnel file as well as to note in that file any in-service programs the person had completed. There was no copy of Dr. Kearns' letter in Dr. Munoz' personnel file and no entry showing completion of a post-graduate course or an in-service program.
Dr. Manuel DePara, while employed at Elgin in the capacity of a physician III, became friendly with Dr. Munoz and had occasion to speak to him concerning his experiences at Elgin and his earlier training. He testified that Dr. Munoz told him that he had graduated from the University of Havana Medical School in 1958 and had then spent some time in Mexico until the spring of 1959. When he returned to Cuba, he had Commander Morgan, a high officer in the Castro regime, "fix" his papers for him. Dr. Munoz also told Dr. DePara that the medical school was closed in 1958 but that he had received credit for working in a hospital. Dr. DePara, who had graduated from the University of Havana Medical School in 1946, testified that he had been in Cuba in 1958 and knew of his own knowledge that the medical school was closed, but had never heard of a program that gave credit for working in hospitals.
Dr. DePara pointed to several discrepancies in the transcript and diploma of Dr. Munoz. These were: (1) that Cuban schools did not measure classroom credit by semester hours as indicated in the transcript; (2) the transcript listed the courses in an order in which they were not offered; (3) the transcript indicated that Dr. Munoz had taken a 5-year course whereas the program required 7 years to complete after a change in the curriculum in 1940; (4) the 1958 diploma of Dr. Munoz was in *1056 the same form as his own 1946 diploma rather than displomas issued during the 1950's; (5) there was no "tilde" over the n in Munoz on the diploma, even though Dr. Munoz spelled his name with it, as was proper; and (6) that the Spanish phrase for "1958" was not used and in its place was an incorrect literal translation from English.
Dr. Miligros Prieto, a doctor with DMH, testified that she had attended the University of Havana Medical School from 1942 to 1949. Her husband graduated in 1957. She identified both her diploma and her husband's, testified to their authenticity and that Dr. Inclan was rector of the medical school for many years including 1957. She testified that she had lived nearby and knew from personal experience that the medical school was closed in 1958. She compared her diploma and her husband's to the 1958 diploma of Dr. Munoz and noted all the discrepancies in the Munoz diploma that Dr. DePara had pointed out. In addition, she observed that the signature of the rector, Dr. Inclan, whom she knew, was misspelled, and the person whose name was signed as Minister of Education was no longer in that position at the time the diploma Dr. Munoz presented was issued.
To prove the charge that the diploma of Dr. Munoz was not authentic, DMH offered several diplomas received by various persons from the University of Havana Medical School for comparison with that of Dr. Munoz. Included were those of Dr. Prieto (1949) and her husband (1957), Dr. DePara (1946), Dr. Villa (1957), Dr. Bardelas (1959) and several others. Utilizing these diplomas as known exemplars, Mr. Doud, an expert document examiner, testified that the signature of the rector on the Munoz diploma was different than the one on the eight other diplomas but that the eight others were in the same handwriting. The printing style and format of the Munoz diploma were different than the known diplomas issued by the University of Havana Medical School between 1957 and 1960 and instead resembled those issued in the 1940's.
The remainder of the evidence offered by DMH concerned the performance of Dr. Munoz as an employee at Elgin. Dr. Manelli, assistant superintendent of Elgin until April 1, 1970, when he became superintendent, testified on behalf of DMH that Dr. Munoz began work on October 25, 1968, as a resident graduate physician in charge of the department of pathology. Dr. Manelli received numerous complaints from other staff members, including doctors and nurses, concerning Dr. Munoz' treatment of patients and other staff members. Dr. Manelli testified that Dr. Munoz treated other members of the staff badly and did not accord to them the courtesy of their positions. On several occasions, Dr. Manelli spoke to Dr. Munoz about his relationships with others, with no apparent improvement. It was reported to Dr. Manelli *1057 that Dr. Munoz was not able to perform his duties in the pathology lab. Dr. Manelli then reviewed Dr. Munoz' credentials and became aware that there was no indication that he had served an internship in this country, and he had doubts about Dr. Munoz' capabilities because of the reports he was receiving from other staff members. Dr. Manelli then asked to see the original of Dr. Munoz' diploma from medical school, but Dr. Munoz refused to show it to him.
Dr. Manelli further testified that in April of 1969, because of his lack of competence in the laboratory, Dr. Munoz took a voluntary demotion at Elgin and was assigned to the infirmary wards under the supervision of Dr. Tuteur. During the time Dr. Munoz was working on the wards, Dr. Manelli received additional complaints and questions; they concerned the medications and treatment ordered by Dr. Munoz which might prove harmful to patients. Doctors Rios and Tuteur, the plaintiff's supervisors on the wards, concurred in reporting to Dr. Manelli that the performance of Dr. Munoz was bad. A credentials committee which consisted of Dr. Tuteur and other doctors considered the complaints against Dr. Munoz. Although the committee was unwilling to discipline Dr. Munoz, it did report that Dr. Munoz was in need of further education and training.
Dr. Tuteur testified that he was Dr. Munoz' advisor and consultant at Elgin after he was assigned to the wards. As head of the credentials committee, he also had occasion to review the performance of Dr. Munoz and came to the conclusion that Dr. Munoz was unable to apply theoretical knowledge in a practical way. Dr. Tuteur was also made aware of personal friction between Dr. Munoz and members of the staff and reminded the doctor in a memo that friction among staff members hindered proper patient care. Dr. Tuteur also had to remind Dr. Munoz in a later memo that he was required to see and examine patients to insure proper psychiatric and/or medical treatment and that he could not simply ignore such calls. After working with plaintiff for over a year, Dr. Tuteur filled out a hospital-rating sheet in which he rated Dr. Munoz' performance as unsatisfactory in job knowledge, productivity, efficiency, initiative and use of time and "because of his poor attitude and poor medical judgment" recommended that his employment be terminated.
Dr. Rios, the director of medicine and surgery at Elgin, testified that he had known Dr. Munoz for several years. Dr. Munoz complained to Dr. Rios that Mr. Higa, the clinical lab supervisor, would not let him use the laboratory for research. Dr. Munoz claimed he needed the laboratory in conjunction with the treatment of his patients because he did not trust the lab results on tests that he had requested. Dr. Rios testified that several of the tests about which Dr. Munoz complained were sent *1058 to another lab for verification and were shown to be accurate. Dr. Rios also spoke to Dr. Jerome, a consulting pathologist from Mt. Sinai Hospital in Chicago, also a witness at the hearing, who informed him of certain discrepancies between Dr. Munoz' educational claims and his apparent lack of actual training. After being informed of this, Dr. Rios came to the conclusion that Dr. Munoz was not trained as a clinical pathologist. When Dr. Klein, the superintendent at the time and Dr. Manelli's predecessor, was informed, he made the decision to remove Dr. Munoz from the pathology department, where he was not properly fulfilling his duties, and assign him to the infirmary ward, accompanied by a demotion from resident graduate physician to physician III. Dr. Rios at this time rated Dr. Munoz' performance as below average to average in the performance categories on the hospital's personnel-rating form.
Dr. Mathurin Jerome testified that he worked at Elgin as a resident in anatomical pathology for 3 months in the latter part of 1968. He shared an office with Dr. Munoz for at least part of that time and had the opportunity to discuss certain cases with him. Dr. Munoz was introduced to him as a pathologist and never informed Dr. Jerome that his training was limited to either clinical or anatomical pathology. Dr. Munoz started doing some cytology readings, or pap smears, a procedure usually performed by anatomical pathologists. Dr. Jerome testified that although Dr. Munoz accepted responsibility for reading certain smears, he found in some instances he was in disagreement with Dr. Munoz' interpretation of the slides involved. On at least two occasions when Dr. Munoz was asked whether a biopsy showed evidence of cancer, Dr. Munoz declined to state an opinion. In one of these instances Dr. Munoz brought the slide to Dr. Jerome at Mt. Sinai Hospital seeking his opinion. Dr. Jerome testified that if Dr. Munoz were a pathologist, he should have been able to see that there was something in the slides and to state an opinion on them. Dr. Jerome testified that he helped Dr. Munoz perform an autopsy which was the responsibility of Dr. Munoz. Dr. Munoz, however, did not follow the proper procedure during the autopsy and Dr. Jerome took over himself. Dr. Munoz never told Dr. Jerome that he was not an anatomical pathologist, and indeed wrote an article on staining methods for tissue smears, a topic within the field of anatomical pathology. Dr. Jerome, however, testified that Dr. Munoz did not appear to be a clinical pathologist because Dr. Munoz asked him to take care of bone marrow slides, usually the job of a clinical pathologist. Since Dr. Jerome was not a clinical pathologist, which Dr. Munoz knew, it was necessary for Dr. Jerome to take the bone marrow slides to Mt. Sinai Hospital to be read by a specialist. These incidents *1059 raised doubts in the mind of Dr. Jerome as to what training Dr. Munoz had in pathology.
Dr. Emilio Orfei, an assistant professor of pathology at Loyola Medical School and a consultant at Elgin Hospital, testified that Dr. Munoz told him that he could do autopsies, but that he was otherwise a clinical pathologist. Dr. Munoz in doing one autopsy claimed to have found a tumor of the aorta, a practically nonexistent condition. When Dr. Orfei examined the body, he found what Dr. Munoz considered to be a tumor was merely a common aneurysm. Dr. Orfei was asked to review Dr. Munoz' interpretation of several cytological smears and disagreed with some of them. Dr. Orfei testified that if Dr. Munoz was only a clinical pathologist, he should not be reading pap smears because that involved anatomical pathology and a proper reading of them was necessary for the welfare of the patients.
Dr. Frederick Volini testified that he worked with Dr. Munoz at Elgin when he was doing consulting work in the pathology lab. Dr. Munoz complained to him several times that the laboratory results on tests, including blood chemistry tests, were inaccurate. Dr. Munoz was unable to explain what was wrong with the tests, but Dr. Volini sent them elsewhere to be double checked. The repeated testing validated the original results; however, Dr. Munoz continued to insist that the results were inaccurate. Dr. Volini testified that in his opinion a man with proper training would not have questioned the tests in the way Dr. Munoz did. For these reasons, Dr. Volini informed Dr. Rios that Dr. Munoz was incapable of directing the laboratory. It was subsequent to this that Dr. Munoz was relieved of his duties as a pathologist and assigned to ward duty.
The finding of the Commission was that the performance of Dr. Munoz after he was assigned to the wards was equally questionable, and the remaining evidence we find it necessary to review deals with that service. Nurse Fidler testified that she directed a pavillion at Elgin and had been a nurse since 1947. She was in charge of the geriatric services in the ward to which Dr. Munoz was assigned. The doctor told Nurse Fidler that he was going to take all epileptic patients off the drug luminal because he was afraid it was addictive. Many of the patients had been epileptic for many years and had been taking luminal for as long to control their seizures. Dr. Munoz took one long-time user of luminal off that drug and prescribed a tranquilizer instead. The patient suffered deterioration of her condition and was ordered to the infirmary by Dr. Munoz. Nurse Fidler asked Dr. Munoz to review his order on the ground that the patient was most likely having withdrawal symptoms because of the removal from luminal and that it was not necessary to send her *1060 to the infirmary. Dr. Munoz nevertheless sent the patient to the infirmary, but Dr. Tuteur returned her to the ward the following day. Nurse Fidler testified that luminal was a sedative necessary to control epileptics, and removal could cause convulsions and other detrimental effects.
A major misuse of drugs testified to by Nurse Fidler were the orders of Dr. Munoz prescribing three powerful diuretics to elderly, frail patients where no edema was apparent. Dr. Munoz prescribed excessive diuretics to at least six patients according to the testimony of Nurses Fidler and Peachy. These prescriptions would result in dehydration and a change in the electrolyte balance of the body. Both reactions would be harmful to the patient. Nurse Fidler also questioned the propriety of Dr. Munoz' prescription of an antidepressant drug, tofranil, to two manic-depressive patients, diagnosed as in the manic state. She reported this prescription to Dr. Tuteur who countermanded the order of Dr. Munoz. For another patient Dr. Munoz prescribed a drug despite the fact that the patient's abnormal reactions to the drug were noted on the patient's ward folder. Dr. Tuteur also countermanded that order. Dr. Munoz' prescription for a patient suffering from a staph infection was 2 grams of keflin to be diluted with water and administered intra-muscularly. Nurse Fidler testified that such a large amount of fluid should not be given intramuscularly because it would be extremely painful and there were better alternatives than the method and drug chosen by Dr. Munoz. Nurse Fidler discussed this prescription with Dr. Munoz but he confirmed the order. Nurse Fidler then called Dr. Manelli who put a stop order on that prescription. Dr. Munoz prescribed 3/4 grain of sodium amytal for another patient when the usual dosage was at least 3 3/4 grains. The dosage prescribed by Dr. Munoz was far too small to accomplish the desired effect. Dr. Tuteur reviewed the order and increased the dosage to 7 3/4 grains for one dosage and then changed the prescription order to another drug. Dr. Munoz prescribed medication including the drug inversine for another patient with high blood pressure, in such combination and dosage that a sudden drop in blood pressure would result. Nurse Fidler testified that to prevent the sudden drop the dosages prescribed should have been lowered by 50% when inversine and two diuretics were ordered in combination as done by Dr. Munoz.
Nurse Fidler also testified that when Dr. Munoz was first assigned to the ward he posted a list of standing orders. They required many varied tests run on all the patients in a given category, i.e., cardiac or cancer patients. Nurse Fidler testified that the ward personnel were not permitted to diagnose patients to determine into what category they fell. Further, Elgin regulations required a doctor to request specifically any tests which he wanted run upon any given patient and to sign a physician *1061 order sheet for tests for each individual patient. A doctor was not permitted by these regulations to order wholesale tests run upon patients in the manner attempted by Dr. Munoz.
Nurse Peachy, a ward nurse under Nurse Fidler, testified and corroborated Nurse Fidler's testimony that Dr. Munoz in several instances prescribed excessive diuretics to patients with no apparent edema, and that he removed epileptics from luminal with the result that at least one patient became extremely agitated. At one point she refused to administer a medication prescribed by Dr. Munoz because the patient was having unusual symptoms after having received the prescription for several days. She testified that Dr. Munoz prescribed a drug to one patient without having run the proper tests before the drug was administered. When Nurse Peachy told Dr. Munoz that she wanted to discuss giving the medication without proper tests with Dr. Tuteur, Dr. Munoz told her to discontinue the drug. Whenever she questioned Dr. Munoz concerning a prescription or treatment, he would not give her any explanation.
Nurse Lanham testified she questioned the order of Dr. Munoz eliminating luminal and dilantin from a 21-year-old epileptic who had been receiving those drugs plus mysoline and prescribing large doses of steroids because after 6 days of the new medication the patient started to have convulsions. Dr. Munoz told her she was the nurse and he as the doctor would make decisions about change of medication.
Mr. MacLachlan, a nurse and the program director of geriatrics and physical rehabilitation, testified that he had seen the patient for which Dr. Munoz had ordered 3/4 grain sodium amytal and knew him to be hyperactive. The patient was so hyperactive that he questioned the low dosage because 3/4 grains would not be enough to quiet the patient. Dr. Munoz refused to change the order. As pointed out above, Dr. Tuteur reviewed the order and increased the dosage to quiet the patient and then prescribed a different drug to be administered thereafter.
Susuma Higa, a clinical laboratory supervisor, testified that on one occasion Dr. Munoz instructed a nurse to fill a tube which Mr. Higa knew to be nonsterile with a serum to be injected into a patient. When Mr. Higa told Dr. Munoz that the tube was not sterile, Dr. Munoz ignored him. Mr. Higa had to stop the nurse from using the nonsterile tube for the injection. Dr. Munoz also requested that Mr. Higa perform a Kahn test upon a patient. When he informed Dr. Munoz that the test was not used anymore and asked him what he was testing for, Dr. Munoz responded that Mr. Higa was not a doctor and would not understand. Mr. Higa also discussed specimen collection with Dr. Munoz because many of his ward specimens were not being refrigerated as fast *1062 as necessary to insure proper results. Dr. Munoz informed Mr. Higa that it didn't make any difference if the specimens were not refrigerated. Mr. Higa, himself, was forced to inform the ward nurses of the need to refrigerate specimens.
Dr. George LeRoy, a professor of medicine at the University of Chicago, was qualified as an expert with a specialty in internal medicine. His testimony was hypothetical and based upon the facts presented by the physicians and nurses who had testified with regard to drugs and treatment prescribed by Dr. Munoz for specific patients. Dr. LeRoy testified that substituting a tranquilizer for luminal in the treatment of epileptics was not good practice because an anticonvulsant such as luminal is required by epileptics. Such a substitution would increase the likelihood of seizures. Administering the drug tofranil to a manic-depressive patient in the manic state was wrong because it was an antidepressant drug, and would make a manic person more so. Dr. LeRoy stated that even if the patient was in the depressive stage, there were many better drugs to administer to alleviate the symptoms. As to treating a staph infection with two grams of keflin administered intramuscularly daily, Dr. LeRoy testified that the dosage was inadequate to treat the problem; however, he testified that this was too large a dosage of keflin to be administered intramuscularly without the risk of infection and causing unnecessary pain. Better drugs could be administered which were safer and less painful. The inadequate dosage could cause the infection to become resistant to the drug, thereby perpetuating rather than stopping the infection. Dr. LeRoy testified that prescribing three potent diuretics to an old lady who had only slight edema of the toes, without any data on her kidney function, was to invite serious complications. Dr. LeRoy continued that administering three diuretic agents is not considered proper among people knowledgeable about edema, kidney disease or blood pressure, and that this was an excessive and improper use of powerful drugs. Dr. LeRoy also testified that the use of the drug inversine for high blood pressure was a poor choice because it required careful supervision. Inversine combined with two powerful diuretics, as Dr. Munoz prescribed for one patient, was an inappropriate use of high-powered drugs and without specific information on the kidney function of the patient was a very bad prescription. As to the 21-year-old epileptic who was removed from luminal and given steroids by Dr. Munoz, Dr. LeRoy testified that the steroids administered would cause a series of seizures and unless the epilepsy was brought under control in a few days, the patient could die.
 1 Dr. Munoz challenges the sufficiency of this evidence to support the charges resulting in his discharge. The rules to be followed in reviewing *1063 a decision of a civil service commission are set forth in Paglini v. Police Board (1975), 61 Ill.2d 233, 335 N.E.2d 480; Davern v. Civil Service Com. (1970), 47 Ill.2d 469, 471, 269 N.E.2d 713; DeGrazio v. Civil Service Com. (1964), 31 Ill.2d 482, 202 N.E.2d 522; Austin v. City of East Moline Board of Fire & Police Commissioners (1972), 7 Ill. App.3d 537, 288 N.E.2d 113; and Monroe v. Civil Service Com. (1965), 55 Ill. App.2d 354, 204 N.E.2d 486. (See also Kerr v. Police Board (1974), 59 Ill.2d 140, 319 N.E.2d 478; Basketfield v. Police Board (1974), 56 Ill.2d 351, 307 N.E.2d 371.) The judicial function is limited to determining whether the findings are supported by the manifest weight of the evidence. In making this determination, the findings of the administrative agency are to be taken as prima facie true and correct. The judgment of the circuit court and reviewing courts should not be substituted for that of the administrative agency, and courts may not reweigh the evidence or make independent determinations of the facts. If the Commission acted upon evidence fairly tending to sustain the charges and its decision is related to the requirements of the service, this court cannot reverse its decision. We hold that the findings of the Commission are supported by the manifest weight of the evidence and sustain the decision to discharge Dr. Munoz.
The first charge against Dr. Munoz was that he had obtained employment with the DMH by the submission of false and misleading information on his application for employment including his claim that he had served an internship and a residency and had been chief of a lab for three previous employers. On different documents submitted to DMH and the Department of Registration and Education, Dr. Munoz claimed to have served a 2-year internship in Cuba and yet to have also spent 5 months in Mexico during the time he was supposedly serving this internship. These written submissions were inconsistent and supported the finding that Dr. Munoz had not served an internship and had supplied false information with the intent of obtaining employment with DMH.
In the employment history given by Dr. Munoz in applying for a position with DMH, he claimed to have been "head" of the lab, a supervisory position, at Ridgeway Hospital. This claim, however, was contradicted by Mr. Disteldorst's testimony that Dr. Munoz was employed as a lab technician, the only one in a very small lab. Dr. Munoz argues on appeal that since he was the only technician there, he was in the responsible position of "head" of the lab, and to state that he had been only a lab technician would downgrade his experience. However, on the same employment application he stated that the position was supervisory. At best, claiming that his position was "supervisory" when he was the only employee is misleading and distorts the usual meaning of the word.
*1064 On the same employment application, he stated that he worked as "chief" of the lab for the Board of Health. On appeal, he argues that no witness ever testified that he was not "chief" of the lab. Mr. O'Sullivan, however, testified that Dr. Munoz was employed only as a chemist III, working under the director of the laboratories and probably also a lab supervisor. This evidence supported the Commission's finding that Dr. Munoz misrepresented the character of his employment at the Board of Health.
Dr. Munoz also claimed to have been "chief" of lab at St. Elizabeth's under Dr. Kearns. At the hearing he introduced the letter allegedly written by Dr. Kearns stating that Dr. Munoz worked as a "supervisor of medical technicians." The difference between these two position descriptions is not merely semantic, as the plaintiff argues on appeal, but is a question of the responsibility and authority of the "chief" of the lab which a "supervisor of medical technicians" would not have. The Commission's finding that Dr. Munoz misrepresented his work at St. Elizabeth's was also supported by the testimony of Sister Bertram that Dr. Munoz was only employed as a lab technician under the supervision of at least two other persons. The Commission's finding should not be rejected on the basis of the Kearns' letter because Sister Bertram's testimony that the records and program of the hospital did not substantiate the letter and its contents casts doubt on the weight and credibility of the letter. The finding of the Commission that Dr. Munoz misrepresented his prior work experience with the intention of obtaining work as a physician with DMH was supported by the manifest weight of the evidence.
The Commission also found that the plaintiff had misrepresented to DMH that he had a valid diploma from the University of Havana Medical School. We hold that the manifest weight of the following evidence considered together supports this finding: The testimony of Doctors DePara, Prieto and Schnepp that the University of Havana Medical School was closed in 1958; the differences in the printing style and format of the diploma presented by Dr. Munoz as compared with others issued by the same school in the 1950's; the misspelling of the signature of the rector on Dr. Munoz' diploma; the absence of the "tilde" over the n in Munoz; the absence of the Spanish phrase for "1958"; Dr. Munoz' admission to Dr. DePara that he had Commander Morgan fix his papers for him; the discrepancies in Dr. Munoz' transcript; the purported signature on the Munoz diploma of a person as minister of education who was no longer in that position when the diploma was issued; plus the fact that the signature of the rector on Dr. Munoz' diploma was in a different handwriting *1065 than the signatures on eight other diplomas issued both before and after Dr. Munoz'.
In an attempt to overcome the finding that his diploma was not valid, Dr. Munoz attacks the validity of the exemplar diplomas which were received in evidence, pointing out that Dr. Prieto failed to identify the signature of the rector. Dr. Prieto testified, however, that she was personally present when the medical school awarded her diploma in 1949 and in 1957 when her husband was awarded his diploma by the dean of the medical school and, therefore, knew both to be genuine. The other diplomas had been submitted in the normal course of checking qualifications of doctors at various institutions and no evidence was offered to raise any doubt as to their authenticity. Further, the signature of the rector was the same on all diplomas except the Munoz diploma. Since the documents were shown to be authentic they were admissible. Once admitted, it was proper for the witnesses to compare those diplomas to the Munoz diploma and note the discrepancies, including the difference in the handwriting of the signature of the rector on the Munoz diploma.
The second charge was that Dr. Munoz obtained a limited license to practice medicine by supplying false and misleading information to the Department of Registration and Education, including the information under Charge 1. The finding of the Commission that the information so provided was false and misleading and supplied with the intention of obtaining a limited license to practice is supported by the same evidence which supports Charge 1 and its repetition is not necessary.
The testimony presented on the third charge, that Dr. Munoz failed to practice medicine in conformity with accepted medical community standards, is voluminous and detailed earlier in this opinion. Doctors Orfei, Jerome and Volini testified to many occurrences displaying plaintiff's lack of knowledge concerning basic pathology procedures. Because Dr. Munoz could not adequately perform his duties in the pathology department, he was reduced in rank to physician III and assigned to direct patient care in the wards. Apparently, Dr. Munoz agreed when he accepted the demotion voluntarily.
The testimony of the witnesses familiar with his performance in the wards supports the Commission's conclusion that Dr. Munoz performed no better in direct patient care than in the laboratory. Their testimony viewed together indicates that the questionable nature of the patient care rendered by Dr. Munoz was caused by a lack of competence rather than, as Dr. Munoz asserts, difference in judgment between medical personnel. Nurses Peachy, Fidler, Lanham and MacLachlan testified in detail concerning highly questionable prescriptions and treatments which *1066 Dr. Munoz ordered, including the administration of three powerful diuretics to frail patients with no visible edema and the removal of epileptic patients from luminal. Several of these orders were countermanded by Dr. Manelli or Dr. Tuteur. There was evidence of adverse reactions of some patients to the medications prescribed by Dr. Munoz. The lack of communication between Dr. Munoz and other staff members was identified as a potential hazard for effective patient care by Doctors Manelli and Tuteur. Finally, the testimony of Dr. LeRoy, an expert answering on the basis of hypothetical questions, established that Dr. Munoz' treatment of various patients varied from dangerous to useless. Dr. Munoz argues that Dr. LeRoy did not specify the standard he was using as the basis of his evaluation of the medications and treatments ordered by Dr. Munoz. He asks whether Dr. LeRoy was using the standards of medicine practiced at the University of Chicago, at Elgin or elsewhere. However, the testimony of Dr. LeRoy supports the finding that Dr. Munoz was unfit to retain his position because it established that the treatment of patients by Dr. Munoz was unacceptable anywhere. On this evidence, the Commission found that plaintiff failed to perform his responsibilities as director of the lab, failed to cooperate with other employees which interfered with the competent functioning of the medical programs and exercised unacceptable medical judgment in his day-to-day treatment of patients, judgment that did not meet the accepted standards of the medical community; this finding was not against the manifest weight of the evidence.
Dr. Munoz argues before this court that the accepted standard of the medical community referred to in the charge against him is vague and has not been defined by the evidence. However, the manifest weight of the evidence supports the finding that Dr. Munoz subjected some of his patients to unnecessary discomfort and pain and prescribed improper and dangerous drugs for them. By any standard which should be applied to the practice of medicine in State institutions or elsewhere, the treatment these patients received from Dr. Munoz cannot be regarded as acceptable or satisfactory. This is sufficient to support the Commission's decision that Dr. Munoz cannot be permitted to continue to treat patients at Elgin.
Dr. Munoz contends that the Commission did not have jurisdiction to consider whether he obtained his limited license from the Department of Registration and Education on the basis of false and misleading data. It is true, as he argues, that the Department of Registration and Education does have responsibility for issuing and revoking all medical licenses. (Ill. Rev. Stat. 1973, ch. 91, § 1 et seq.) However, the issue before the Commission was whether plaintiff could be discharged from the hospital because he had been shown to have supplied false and misleading information *1067 in order to obtain his limited license. Since Dr. Munoz could not have obtained a position with DMH without the license, DMH does have an interest in the validity of the information supplied to obtain the license, even though it has no power to revoke the license itself. What constitutes cause justifying discharge is not necessarily the same as the justification for revoking a medical license. (Ill. Rev. Stat. 1973, ch. 91, § 16a.) The Commission had no authority to revoke Dr. Munoz' limited license and did not attempt to do so. What the Commission did find was that Dr. Munoz had obtained the license through misleading and false information and for that reason the decision of DMH that he was an undesirable employee and to seek his discharge was justified. See Ill. Rev. Stat. 1973, ch. 127, § 63b101 et seq.
 2, 3 The plaintiff also argues that the discharge effectively denied him the right to practice medicine and, therefore, the Commission was required to apply the strict standard set out in the Medical Practice Act requiring a finding of gross negligence before a physician's license can be revoked. (See Ill. Rev. Stat. 1973, ch. 91, § 1 et seq.) The Medical Practice Act does not apply to civil service hearings and does not establish the causes for which an employee of a State institution may be discharged. Failure to practice medicine in conformity with accepted medical community standards or treatment of patients in a manner harmful to them is obviously a valid ground for discharging an employee hired as a physician. Dr. Munoz argues that because his limited license permits him only to work in specified State institutions his discharge has in effect revoked his limited license, and he, therefore, was entitled to have qualified medical specialists rather than the Commission consider the charge concerning his competency as a doctor. The logical result of this argument would be a judicially-created rule requiring stricter standards for the discharge by a State institution of a doctor with only a limited license than for discharging a doctor who was fully licensed to practice medicine in Illinois, an incredible outcome. The discharge by DMH does not prevent Dr. Munoz from applying to other State institutions for a position or from taking the examination to become fully licensed as a practicing physician in Illinois.
The facts proved constitute cause for discharge because they support the findings of the Commission that the continued employment of Dr. Munoz at Elgin would be a hazard to the patients under his care as well as to the efficient operation of the hospital. The judgment of the circuit court is accordingly affirmed.
Judgment affirmed.
BURKE, P.J., and GOLDBERG, J., concur.
NOTES
[1] There is nothing in the record to explain the fact that Dr. Munoz apparently worked at Ridgeway and St. Elizabeth's at the same time.