ROBERT IWANSKI, Plaintiff-Appellee, v. STREAMWOOD POLICE PENSION BOARD, Defendant-Appellant.

First District (2nd Division)   No. 1—91—0081

Opinion filed June 30, 1992.

Puchalski, Keenan & Reimer, of Chicago (Richard J. Reimer, of counsel), for appellant.

James M. McGing, of Chicago (Robert J. Egan and Francis A. Nolan, of counsel), for appellee.

JUSTICE SCARIANO delivered the opinion of the court:

On July 31, 1978, plaintiff Robert Iwanski was hired as a patrol officer by the Village of Streamwood. On June 16, 1989, Iwanski met with Deputy Chief Rudolph Rossmy at which time he informed Rossmy that he had been going to family counseling for the prior year and a half and requested that he be permanently placed on the day shift in order to improve his chances of getting his family life back together. Iwanski told Rossmy that he was being counseled for deep depression, that he had come close to committing suicide in the past, that he was taking 100-milligram capsules of the prescription drug Tofranil and that he was under psychiatric care. After consulting with Chief Schmidt, Sergeant Kunz and Iwanski's psychiatrist, Dr. Mohinder Chadha, who requested that Iwanski be put on medical leave, Rossmy placed Iwanski on a four-day emergency medical leave and relieved him from the possession of four firearms. Dr. Chadha also requested that a conference be held between herself, Iwanski, and Schmidt to address police department concerns.

At the conference, which was held on June 20, 1989, Iwanski, his wife, Dr. Chadha, social worker Gary Wakefield, Deputy Chief Paul Rauscher and Schmidt met to discuss Iwanski's condition. At the conference Iwanski complained that the department was insensitive to his needs. He also described his feeling of loss when a friend left the department for another job, which, he explained, left him with no one to confide in at work. Iwanski indicated that the only way he could gain progress in resolving his family problems was to be assigned to the day shift on a permanent basis. Wakefield stated that the department's insensitivity to Iwanski's needs resulted in his frustration at work and his problems at home. Dr. Chadha indicated that the day watch would best serve Iwanski's recovery and his intake of the drug

Tofranil. However, Schmidt explained that he could not assign Iwanski to the day shift on a permanent basis because of the small size of the department. At Schmidt's request Dr. Chadha submitted a certification letter to him recommending that "Iwanski should return to work full time on day shifts and he should continue his treatment as recommended."

In a letter dated June 23, 1989, Schmidt requested that Eric Ostrov, a psychologist with the Issac Ray Center in Chicago, perform a psychological examination of Iwanski to determine his fitness for duty. Schmidt indicated to Ostrov that he was concerned about Iwanski's inability to adjust to the political environment of police work and to the 24-hour schedule, his past history of on-the-job injuries, his suicidal thoughts, depression, anger and his perception that the police department was to blame for his problems. He also indicated that he wanted to know whether Iwanski should be allowed to continue his employment as a police officer and, if he were, whether he would be a threat to his family, his colleagues or the community. Schmidt noted in the letter that Iwanski was enrolled in a real estate educational program and would therefore have a career upon which to fall back if he were to be discharged from the department. According to the letter Iwanski had been re-assigned from the field to the communications dispatch center.

On August 10, 1989, Schmidt temporarily suspended Iwanski from duty and placed him on administrative leave pending final adjudication of his fitness to serve as a police officer. On August 21, 1989, Iwanski filed an application for a disability pension with the Streamwood Police Pension Board (Pension Board or Board). In a letter dated August 23, 1989, Schmidt brought charges against Iwanski before the Board of Police and Fire Commissioners of the Village of Streamwood, and pursuant to the Village's labor agreement with the union representing the police, informed the Commissioners that he was designating them to conduct Iwanski's fitness hearing. The purpose of the inquiry, which was based on facts contained in Ostrov's evaluation of Iwanski, was to determine whether, because of a physical or mental impairment, Iwanski's continued employment as a police officer was detrimental to the health, safety and welfare of the Village. On October 23, 1989, the Commissioners found that Iwanski was no longer mentally fit for duty and he was discharged the next day. After his discharge, the Pension Board held hearings in February and March of 1990 on Iwanski's application for a disability pension, which it denied on May 23, 1990. On June 7, 1990, Iwanski filed a complaint in the circuit court for administrative review of the Board's decision,

and on November 15, 1990, the court reversed the Board's decision. The Board appeals from the circuit court's determination that Iwanski was entitled to a non-duty disability pension, and Iwanski cross-appeals on the ground that he was entitled to a duty-related pension.

I

Upon administrative review, the function of both the trial court and the appellate court is limited to determining whether the findings and conclusions of the administrative agency are against the manifest weight of the evidence. (*Fenton v. Board of Trustees* (1990), 203 Ill. App. 3d 714, 716.) In order to make such a finding, a court must conclude that all reasonable and unbiased persons, acting within the limits prescribed by law and drawing all inferences in support of the finding, would agree that the finding is erroneous and that the opposite conclusion is clearly evident. (*Batka v. Board of Trustees of the Village of Orland Park Police Pension Fund* (1989), 186 Ill. App. 3d 715, 722.) However, when analyzing claims arising from an administrative agency's determinations, the agency's findings and conclusions on questions of fact are held to be *prima facie* true and correct (*Batka*, 186 Ill. App. 3d at 722), and because the weight of the evidence and the credibility of the witnesses are within the province of the board, there need only be some competent evidence in the record to support its findings. (*Hahn v. Police Pension Fund* (1985), 138 Ill. App. 3d 206, 209.) Similarly, the decision of an administrative agency will also be reversed if it is legally erroneous. (*Donnells v. Woodridge Police Pension Board* (1987), 159 Ill. App. 3d 735, 739, *appeal denied* (1988), 118 Ill. 2d 542, *cert. denied* (1988), 487 U.S. 1219, 101 L. Ed. 2d 908, 108 S. Ct. 2873.) However, the court is not bound to accord the same measure of deference to an administrative agency's construction of a statute as would be given to an agency's finding of fact. (*Donnells*, 159 Ill. App. 3d at 739.) It is to be further noted that a plaintiff to an administrative proceeding has the burden of proof and relief will be denied if he fails to sustain that burden. *English v. Village of Northfield* (1988), 172 Ill. App. 3d 344, 348, *appeal denied* (1988), 123 Ill. 2d 557.

In support of its position that Iwanski should be denied disability pension benefits the Board raises two arguments on appeal: (1) that because of his discharge Iwanski was no longer entitled to pension benefits, and (2) that he was not disabled.

Membership in a pension system of any local government unit in the State is an enforceable contractual relationship, the benefits of which shall not be diminished or impaired. (*DiFalco v. Board of*

*Trustees of the Firemen's Pension Fund of the Wood Dale Fire Protection District No. One* (1988), 122 Ill. 2d 22, 26, citing Ill. Const. 1970, art. XIII, §5.) Further, the provisions of a police pension plan are to be construed liberally in favor of those to be benefitted. *Batka,* 186 Ill. App. 3d at 722.

The Illinois Pension Code (Code) (Ill. Rev. Stat. 1977, ch. 108½, par. 1—101 *et seq.*) provides for "line of duty" and "not on duty" police disability pensions.[1] Section 3—114.1 of the Code provides for line of duty disability pensions under the following circumstances:

> "If any policeman, as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty, is found to be physically or mentally disabled for service in the police department, so as to render necessary his suspension or retirement from the police service, such disabled policeman shall be granted a disability retirement pension of 65% of the salary attached to his rank on the police force at the date of suspension of duty or retirement. A policeman shall be considered 'on duty', while he is on any assignment, approved by the chief of the police department, even though such assignment causes him to be away from the municipality in which he serves as a policeman, if such assignment is related to the police protection service of such municipality." Ill. Rev. Stat. 1977, ch. 108½, par. 3—114.1.

Section 3—114.2 provides for a non-duty disability pension for:

> "Any policeman who becomes disabled as a result of any cause other than the performance of an act of duty, and who is found to be physically or mentally disabled so as to render necessary his suspension or retirement from service in the police department, shall be granted a disability pension of 50% of the salary attached to his rank on the police force at the date of suspension of duty or retirement." Ill. Rev. Stat. 1977, ch. 108½, par. 3—114.2.

### A. DISCHARGE

Because Iwanski was discharged from the police force, the Board held that the Pension Code as well as the Illinois Supreme Court's decision in *Di Falco v. Board of Trustees of the Firemen's Pension*

---

[1]We note that this dispute is governed by the terms of the Pension Code at the time Iwanski became a member of the pension system. *Kerner v. State Employees' Retirement System* (1978), 72 Ill. 2d 507, 514, *cert. denied* (1979), 441 U.S. 923, 60 L. Ed. 2d 397, 99 S. Ct. 2032.

*Fund of the Wood Dale Fire Protection District No. One* (1988), 122 Ill. 2d 22, required it to deny his application for a disability pension. However, the circuit court held on the authority of *Stec v. Oak Park Police Pension Board* (1990), 204 Ill. App. 3d 556, *appeal denied* (1991), 136 Ill. 2d 555, that Iwanski's discharge did not preclude him from receiving a disability pension because, unlike *Di Falco*, Iwanski was a police officer at the time he applied for it. The Board's findings indicate that Iwanski was a member of the Streamwood police department from July 31, 1978, until his discharge on October 24, 1989, but that he filed his application for disability on August 21, 1989, and that Schmidt filed charges against him on August 23, 1989. Therefore, it is clear that Iwanski filed his application before he was discharged.

The issue presented for review in *Di Falco* was "whether a probationary fire fighter is entitled to a disability pension when the fire fighter first applies for the pension a year after his discharge." (*Di Falco*, 122 Ill. 2d at 24-25.) There, the plaintiff allegedly suffered a spinal injury, went on disability leave and was eventually discharged. Both the board and the circuit court found, as a matter of law, that the plaintiff was not entitled to a disability pension because, due to his discharge, he was not a fire fighter at the time of his application. (*Di Falco*, 122 Ill. 2d at 25-26.) "The gist of the holding of the board and trial court, as well as of defendant's argument," was that pursuant to section 4—110 of the Pension Code (Ill. Rev. Stat. 1981, ch. 108½, par. 4—110), which provides for duty-related disability pension benefits for fire fighters, "an individual must be a 'fireman,' as used in that section, at the time of the application." (*Di Falco*, 122 Ill. 2d at 25.) Our supreme court reasoned:

"[U]pon reviewing article 4 of the Pension Code as a whole, it becomes apparent that the purpose of a duty-related disability pension is to help provide only for fire fighters *** who, if not for the disability, would still be employed as fire fighters and drawing their regular salary. On the other hand, the scheme of the Pension Code indicates that the purpose of a duty-related disability pension would not be served by granting a disability pension to an applicant who is no longer employed as a fire fighter because he has been discharged." *Di Falco*, 122 Ill. 2d at 27.

The court cited several sections of the Pension Code in support of its interpretation of section 4—110 that disability pensions were not meant for discharged fire fighters. For example, it noted that section 4—101 of the Code (Ill. Rev. Stat. 1981, ch. 108½, par. 4—101) provided that the firemen's pension fund was established for the benefit

of firemen, who were defined in section 4—106 (Ill. Rev. Stat. 1981, ch. 108½, par. 4—106) as persons employed by a city in its fire service. Accordingly, the court found that "a discharged fire fighter is obviously not 'employed,' in any sense of the word, by a city in its fire service and the pension fund was not established for his benefit." (*Di Falco*, 122 Ill. 2d at 28.) Next, the court pointed out that section 4—112 (Ill. Rev. Stat. 1981, ch. 108½, par. 4—112), which governs the determination of disability and restoration to active service, stood "as further evidence of the selective purpose of a duty-related disability pension." (*Di Falco*, 122 Ill. 2d at 28.) The court found that the provisions of that same section, which provide that a disabled fire fighter is subject to annual physical examinations and has the right to return to work if he is no longer disabled, "strongly indicate that disability pensions are to be given only to fire fighters who would still be employed as fire fighters if not for their disability." (*Di Falco*, 122 Ill. 2d at 29.) Finally, the court found that section 4—113 (Ill. Rev. Stat. 1981, ch. 108½, par. 4—113), which allows disabled fire fighters to elect to retire if certain requirements are met, indicated "that in order to begin receiving a disability pension, fire fighters must not have been discharged" because a discharged fire fighter cannot elect to retire. (*Di Falco*, 122 Ill. 2d at 29.) Instead, the court explained that pursuant to section 4—116 (Ill. Rev. Stat. 1981, ch. 108½, par. 4—116), "the scheme of the Pension Code is to provide a refund for discharged fire fighters who have not received disability before being discharged." *Di Falco*, 122 Ill. 2d at 30.

However, the court narrowly defined its holding:

"In summary, upon reviewing article 4 of the Pension Code as a whole, we conclude that the primary purpose of the establishment of a duty-related disability pension under section 4—110 is to provide for the benefit of fire fighters who would still be employed as fire fighters and receiving a salary if not for the disability. Discharged fire fighters are no longer fire fighters because of the discharge, not the disability. To allow fire fighters who have been discharged to apply for disability pensions under section 4—110 would disrupt the pension scheme established by the legislature. Accordingly, the term 'fireman' as used in section 4—110 is operative both at the time of the impairment and application. To receive a disability pension under section 4—110, a fire fighter must not have been discharged prior to application therefor." *Di Falco*, 122 Ill. 2d at 30.

Nevertheless, the Board contends that regardless of its narrow holding, the rationale of *Di Falco* applies in this case. The Board asserts that in order to be eligible for a disability pension, the applicant must be a police officer at the time of the application as well as the receipt of benefits. According to the Board, the crucial factor is not the time of the application, but rather, the effect of the discharge on the right to receive disability benefits. The Board, as did the court in *Di Falco*, draws upon other provisions of the Code in support of its position. For example, the Board points out that, pursuant to section 3—106 of the Pension Code (Ill. Rev. Stat. 1977, ch. 108½, par. 3—106), a police officer is defined as any person who is appointed to a police force and sworn and commissioned to perform police duties. Accordingly, the Board argues Iwanski is no longer a police officer because he has been discharged. The Board also notes that, pursuant to section 3—115 (Ill. Rev. Stat. 1977, ch. 108½, par. 3—115), a "[m]edical examination of a policeman retired for disability shall be made at least once each year prior to the attainment of age 50, as a check of the continuance of the disability for service as a policeman" and that pursuant to section 3—116 (Ill. Rev. Stat. 1977, ch. 108½, par. 3—116), the Board shall certify to the chief of police that an officer is able to resume his duties if he is found to have recovered from his disability. On the basis of these provisions the Board argues that because of his discharge, it would have no authority to return Iwanski to active duty if he were found to have recovered. The Board also notes that, pursuant to section 3—116.1 (Ill. Rev. Stat. 1977, ch. 108½, par. 3—116.1), a police officer, under certain circumstances, may elect to convert his disability pension into a retirement pension, and that, therefore, the legislature could not have intended to allow Iwanski the opportunity to elect to receive a retirement pension when he has been discharged from the department.

In further support of its position, the Board relies on the authority of *Freberg v. Board of Trustees of the Firemen's Pension Fund* (1970), 128 Ill. App. 2d 369, in which a fire fighter applied for a disability pension after being discharged for indecent exposure to children. In finding that the provision entitling a fireman to non-duty disability pension implied that the applicant must still be a fireman at the time of the application, the court reasoned that the phrase "any fireman" meant "a fireman on active duty, one on inactive duty, one on a leave of absence, one suspended, or one retired, but not an individual who has been discharged." (*Freberg*, 128 Ill. App. 2d at 374.) As the Board points out, the court in *Freberg* recognized that the effect of granting a non-duty disability pension to a discharged fire

fighter "would be to place him in a special classification wherein he would receive the benefits of these [Pension Code] sections, without being bound by the obligations. Thus, a person discharged for cause would benefit from a special classification which arose from that discharge, permitting him to profit from his own misconduct." (*Freberg*, 128 Ill. App. 2d at 374.) According to the Board, the purpose of the Pension Code is to provide disability benefits to injured officers and not to allow discharged officers to collect severance pay. The Board acknowledges that Iwanski is entitled to a refund of his contributions to the fund under section 3—124 of the Pension Code. Ill. Rev. Stat. 1977, ch. 108½, par. 3—124.

In response, Iwanski relies on the authority of *Stec v. Oak Park Police Pension Board* (1990), 204 Ill. App. 3d 556, in which the court held that a police officer who applied for a duty-related disability pension after disciplinary charges were filed against him but before tendering his resignation and reserving his right to pursue a disability pension was not precluded from receiving a disability pension since, unlike *Di Falco*, he was a police officer at the time he applied for the pension. In support of its holding the court in *Stec* relied on the authority of *Hahn v. Police Pension Fund* (1985), 138 Ill. App. 3d 206. (*Stec*, 204 Ill. App. 3d at 562-63.) There, the police officer, as did the officer in *Stec*, applied for a disability pension after charges were filed against him but before resigning and reserving his right to a pension. (*Hahn*, 138 Ill. App. 3d at 207-08.) The court held that the officer did not intend to relinquish his rights to a pension because he applied for the pension before resigning and since he specifically preserved his right to pursue a disability pension in his resignation. In addition, the court construed the phrase "[a]ny policeman" in section 3—114.2 of the Code (Ill. Rev. Stat. 1981, ch. 108½, par. 3—114.2) "to encompass a retired police officer, inasmuch as the statute itself envisions that the officer's condition will necessitate 'suspension or retirement.' " (*Hahn*, 138 Ill. App. 3d at 212; *Stec*, 204 Ill. App. 3d at 562-63.) Despite the defendant's assertions to the contrary, the court in *Stec* refused to accept that *Di Falco* overruled *Hahn*, because the court in *Di Falco*, although reversing the Second District Appellate Court, which decided *Hahn*, failed to mention the *Hahn* case in its opinion and because it narrowly tailored its holding. *Stec*, 204 Ill. App. 3d at 563-64.

In connection with the provisions of the Code cited by the Board in support of its position, Iwanski responds on the authority of *Hahn* that if he refused to submit to annual examinations to verify his disability the Board could discontinue his disability payments. (See

*Hahn*, 138 Ill. App. 3d at 212-13.) In addition, he states that section 3—147 of the Code (Ill. Rev. Stat. 1977, ch. 108½ par. 3—147), which bars disability pension payments to persons convicted of felonies, indicates that the legislature has chosen to bar only convicted felons from receiving benefits.

The Board claims that *Hahn* and *Stec* are distinguishable since the officers in those cases resigned and because they reserved the right to apply for a pension in their resignations. According to the Board, an "involuntary discharge for misconduct is significantly different than a voluntary resignation."

Recently, in *Greenan v. Board of Trustees of the Police Pension Fund* (1991), 213 Ill. App. 3d 179, *appeal denied* (1991), 141 Ill. 2d 540, the court was faced, as we are here, with the issue of "[w]hether an applicant for a disability pension must remain employed as a police officer beyond the time of application for those benefits." According to the court, *Freberg* and *Di Falco* ruled only on the effect of an applicant's employment status at the time of the application. Acknowledging that there were no hard and fast rules for resolving this issue, the court found that a disabled police officer's resignation did not sever his right to a line of duty disability pension where he was a commissioned police officer at the time of his knee injury, at the time of his application for disability pension benefits and at the time of the hearings on his application. *Greenan*, 213 Ill. App. 3d at 186.

■■ In light of the foregoing authorities and the facts of this case, we find that Iwanski's discharge does not prevent his being awarded a disability pension. We disagree with the Board's claim that *Hahn* and *Stec* are distinguishable because the plaintiffs in those cases resigned whereas in this case Iwanski was discharged. Furthermore, our holding is not inconsistent with the provisions of the Code cited by the Board. In *Greenan* the court noted that, unlike fire fighters, "police officers on disability pension are not subject to recall to active duty upon recovery from their disability." According to the court:

> "This is one instance where article 3 of the Code differs from article 4 on fire fighters' pensions. Section 3—116 of the Code does not *mandate* reinstatement to active service upon recovery of disability, but only requires the Board 'certify to the chief of police that the member is no longer disabled and is able to resume the duties of his or her position.' (Ill. Rev. Stat. 1989, ch. 108½, par. 3—116.) This certification does not require the pensioner be returned to duty, nor does it provide an absolute right to his or her old position. In contrast, section 4—112 of the Code states that when a fire fighter recovers from dis-

ability, the 'firefighter *shall* report to the marshal or chief of the fire department, who *shall* thereupon order reinstatement into active service.' (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 108½, par. 4—112.) Thus, the mandatory reinstatement to active duty which *Di Falco* and *Freberg* found was prevented by a fire fighter's discharge does not exist in the instant case." *Greenan*, 213 Ill. App. 3d at 185.

Similarly, with respect to section 3—116 of the Code, which requires that a pensioner is subject to recall for emergency duty and is required to submit to annual examinations, the court in *Greenan* stated, on the authority of *Hahn*, that "[t]hese obligations do not arise from plaintiff's employment status with the police department but rather from the Board's jurisdiction over one receiving disability pension benefits." (*Greenan*, 213 Ill. App. 3d at 186-87.) Accordingly, the court held that the plaintiff continued to be bound by the obligations of section 3—116 and that the Board would be justified in terminating his benefits if he refused to comply with its provisions. (*Greenan*, 213 Ill. App. 3d at 185-87.) For the reasons and subject to the limitations discussed above, we hold that Iwanski's discharge does not bar his entitlement to a disability pension.

## B. DISABILITY

With respect to the issue of disability, the Board found that the more credible medical evidence led it to conclude that "Iwanski's alleged emotional, mental and physical states were not a result of something that occurred in connection with service in the police department and that [Iwanski] was not disabled." The circuit court reversed the Board's decision that Iwanski was not disabled as being against the manifest weight of the evidence and found that he was entitled to a non-duty disability pension.

Dr. Anthony D'Agostino examined Iwanski at the direction of the Board on September 21, 1989, and October 2, 1989, and on the basis of these examinations and his review of Ostrov's report, he certified that Iwanski was disabled for service in the police department. He also reported that Iwanski stated that his troubles began sometime in 1985 with the hiring of a new police chief and the subsequent implementation of new policies which resulted in his job dissatisfaction and poor performance. Iwanski also attributed his problems to a back injury he received in 1985, and felt that his superiors were unfairly discriminating against him because of his involvement in bringing a police union to the Village. He said that in 1987, he began having problems at home because of his job stress. He reported having two

"out of body experiences" in 1986 and three in 1987, in which he saw himself committing suicide. He began therapy and eventually took the medication Tofranil. His family problems grew worse in 1988 as a result of his daughter's marriage and his son's entrance into the Marines. Iwanski reported that he no longer suffered from severe anxiety or depression, that he was not disabled and that he felt he could return to duty. Dr. D'Agostino, who reviewed Ostrov's report as part of his evaluation, found that Iwanski had a history of psychological problems and that his problems appeared to be "an outgrowth of longstanding personality problems which, under pressure, become accentuated and give rise to the symptoms listed above." Dr. D'Agostino concluded that:

"[T]he day to day expectations of active duty police work, especially with rotating shifts, are beyond Officer Iwanski's capacity at this time. The evidence further suggests that this has been a problem for a number of years and this situation is not likely to change in the near future, even with therapy. In my opinion he does not have the kind of personality suitable for police work. In my opinion his symptoms are non-specific in nature and not 'caused' by his having been a police officer."

Dr. Michael Rogers, also examined Iwanski at the direction of the Board on December 14, 1989, and as part of his evaluation, he read Dr. Chadha's letter as well as the reports of Dr. D'Agostino and Ostrov. He, too, certified that Iwanski was disabled. Dr. Rogers agreed with Dr. D'Agostino that Iwanski was "disabled for the day to day swing shift expectations of a police officer." He felt that Iwanski had been clinically depressed since 1987 and that Iwanski's disability seemed to have been precipitated by his frustrations at work. He also reported that the anxiety attack which Iwanski suffered in 1970 was "clearly a much more minor episode" than his depressive episodes of the past two years. Dr. Rogers reported that Iwanski felt his problems started in 1984 and progressed in 1985 after he injured his back while making an arrest. He concluded that Iwanski was "disabled for any kind of police work, and apparently any kind of swing shift work." He felt that Iwanski's "depressive disorder might well have occurred in any work requiring the flexibility of his police job" and that Iwanski's family stresses were "not of the order that would be a serious problem to a person with average emotional flexibility."

Ostrov had conducted a clinical evaluation of Iwanski at Schmidt's direction shortly after the conference of June 20, 1989, in order to determine Iwanski's ability to return to full active duty as a police officer. In addition to interviewing Iwanski, Ostrov interviewed Iwanski's

wife and his psychotherapist, Gary Wakefield, conducted two diagnostic tests and reviewed Streamwood police department records on Iwanski, including Dr. Chadha's letter. He reported that Iwanski showed no "marked depressive symptomatology" and "manifested no psychotic symptomatology." He stated that Iwanski said his psychiatric symptoms began about four years before. Ostrov stated that although Iwanski focused on problems at work, he indicated a long history of psychiatric difficulty. According to Ostrov, Iwanski said that he had been nervous all his life, and that when he was about seven or eight, he had a problem with upset stomachs especially around holidays. He also said that he had a bleeding ulcer when he was 18 and a breakdown in 1970 for which he was given Valium. Iwanski also reported an angina attack which Ostrov concluded was apparently caused by stress. However, Iwanski testified at the pension hearing that he never told Ostrov that he had a previous history of problems, that Ostrov did not ask him any questions about his ulcers, and that his angina attack was caused by a virus.

In addition, Ostrov reported that Iwanski told him his problems started as the result of a back injury he received in 1985. Iwanski stated that he was off for sixth months because of the injury and was questioned about excessive use of sick time. He stated that he was turned down for a pay raise while he was off and that he became angry. Iwanski speculated that his involvement in the union was one reason for the inquiry. He further stated that he was the subject of many inequities when he returned to work and that his grievances at work had built up over the years. He also reported stress over family problems. He told Ostrov that he became quite depressed in February of 1988 because of a scheduling conflict and it was at this time that he reported having out-of-body experiences. He said his depression began to lift as a result of medication and his being put on the day shift, but that his problems returned when he went back to the 3 to 11 shift.

Ostrov reported that the Millon Clinical Multiaxial Inventory-II (MCMI) indicated "schizoid, avoidant, dependant and passive-aggressive traits" and "marked anxiety and depression." Similarly, the Minnesota Multiphasic Personality Inventory (MMPI) indicated "a wide variety of psychopathology, marked by depression, anxiety, and cognitive disfunction." Ostrov concluded that:

"Officer Iwanski evidences a long history of psychiatric problems that predate his employment by the Police Department. There are indications in recent years of intense depression with accompanying suicidal ideation. According to Officer Iwanski, his wife, and his psychotherapist, he has improved with treat-

ment and medication. At the same time, interview and test results point to serious continuing emotional problems. Indications are that he continues to manifest significant anxiety and depression. Of great concern is that under stress he continues to exhibit significant anger almost to the point of loss of control. \*\*\* [He] expressed no confidence that he could cope with rotating shifts. \*\*\* I recommend that Officer Iwanski not be returned to full active duty as a Streamwood police officer. He has been in treatment for years, apparently with limited success. \*\*\* This evaluation raises serious questions about whether Officer Iwanski will have the capacity to function as a police officer at any time in the future.

\*\*\* [H]e should not be re-evaluated until sufficient time has passed for him to make further theraputic progress."

Dr. Clifton Rhead, who examined Iwanski on November 10, 1989, at Iwanski's request, also certified that Iwanski was disabled. He found that Iwanski "has suffered from severe depressions for four to five years," but that he "showed no evidence of a major psychiatric disorder." Although he noted that Iwanski had psychiatric treatment in 1970, he also found that Iwanski subsequently served in the police department "for six years without impairment." According to Dr. Rhead, "the precise precipitating event(s) for the current impairment is [*sic*] difficult to determine but appear to have had little effect until approximately 1984 or 1985." He stated that the issue of whether or not Iwanski's disability resulted from police service depends on one's definition of causality. He continued, "one can say with certainty that the predisposing factors were present, but with much less certainty that the precipitating stress was that of his service with the police department." Dr. Rhead diagnosed Iwanski as having major depression which was in remission due to medication. He concluded that Iwanski was not fit for duty and would not be fit for duty in the forseeable future.

In her letter of June 22, 1989, to Schmidt, Dr. Chadha wrote that Iwanski had been under her care and that he had been in counseling for a year and a half. She noted that she put him on medication after he became more depressed and had suicidal thoughts in February of 1989. She noted that Iwanski had discussed his problems at work with her, including his feeling that he was being discriminated against. He told her that his problems at work resulted in his problems at home. She recommended that he be put on the day shift in order to reduce his stress, to give him time to spend with his family, to better schedule his medication, and to allow him to attend group therapy once a

week. She stated that in his last individual session he was not suicidal or homicidal and that he reported he was feeling better with medication. She recommended that "Iwanski should return to work full time on day shifts and he should continue his treatment as recommended."

In support of its conclusion that Iwanski was not disabled, the Board relied on Dr. Chadha's letter and noted that she had been treating Iwanski for a year and a half, longer than any other physician who evaluated him. The Board also relied on statements made by Iwanski to Dr. D'Agostino in which he related to the doctor that he was not disabled and could carry out the requirements of his job. The Board further argues on the authority of *Wall v. Police Pension Board* (1988), 178 Ill. App. 3d 438, that Iwanski's job stress or job dissatisfaction does not constitute a disability. This argument is based on several statements made by Iwanski to Dr. D'Agostino which indicated that he was disenchanted with his job.

Iwanski responds that the Board has taken Dr. Chadha's report out of context and that it does not demonstrate that he is not disabled. Iwanski further argues that his statements must be viewed in light of the fact that he was suffering from severe depression. Moreover, he points out that the Board of Police and Fire Commissioners adjudicated him unfit to be a police officer in response to Schmidt's charges that he was no longer mentally competent. He asserts that the circuit court was correct in finding that *Wall* was distinguishable and in finding that the Board's decision was against the manifest weight of the evidence. We agree.

■ All three of the physicians who examined Iwanski for the purposes of the pension hearing near the time of his application certified that he was disabled. Two of these three doctors were selected by the Board. Whatever the Board wants to make of Iwanski's statements to Dr. D'Agostino, it is important to note that the doctor to whom those statements were made concluded that Iwanski was disabled. In addition, Ostrov, who examined Iwanski about three months earlier, found that Iwanski was unfit for duty and that clinical tests indicated Iwanski exhibited "schizoid" traits and "a wide variety of psychopathology." Indeed, it was Ostrov's findings which formed the basis for the decision of the Board of Police and Fire Commissioners that Iwanski was unfit for duty because of his mental problems. Dr. Chadha's letter, which was completed about three months before the evaluations made by the other doctors, clearly states that Iwanski was ready to return to the day shift, a shift which was unavailable according to Schmidt. Dr. Rogers, one of the experts who examined Iwanski at the Board's request, interpreted Dr. Chadha's letter to mean that

Iwanski "was not disabled for work providing he could be assigned to a day shift." Schmidt also acknowledges this fact in his letter to Ostrov by emphasizing that Dr. Chadha's letter recommends that "Officer Iwanski return to work full time on *day shift*." Further, it is clear from Dr. Chadha's letter that Iwanski's problems were being controlled with the aid of medication and therapy, and that she recommended the day shift to facilitate the scheduling of his medication and therapy.

Moreover, the evidence of mental disability in this case is much greater than in *Wall*. There, a police officer, who was seeking a duty-related disability pension, told the Board that he "no longer had fun on the job" and "did not feel he could handle the job anymore." On one occasion he experienced severe chest pains which he attributed to stress, but a doctor diagnosed him with mild pleurisy. He was put on emergency suspension when he told his commander that he was experiencing severe emotional strain and could not continue to work. He did not return to work thereafter. (*Wall*, 178 Ill. App. 3d at 439-40.) In any event, the issue on appeal in *Wall* was whether or not the plaintiff's stress was job related. Although the plaintiff claimed that he suffered from police stress syndrome and was therefore entitled to a job-related disability pension (*Wall*, 178 Ill. App. 3d at 442), the evidence varied significantly as to whether the plaintiff's stress was in fact job related (*Wall*, 178 Ill. App. 3d at 440-41) and the appellate court affirmed the Board's finding that the plaintiff did not prove that his stress was the result of the performance of an act of duty. *Wall*, 178 Ill. App. 3d at 444.

We find this case to be similar to the *Hahn* case, in which the appellate court, in reversing the circuit court's affirmation of a pension board decision, found that the plaintiff was entitled to a non-duty disability pension where three of the four psychiatrists who examined the plaintiff near the time of his retirement found that he was disabled. (*Hahn*, 138 Ill. App. 3d at 210.) Likewise, in *Batka*, the appellate court, in reversing the circuit court, found that a pension board's decision was against the manifest weight of the evidence where three psychiatrists found that the plaintiff was disabled, one psychiatrist found that although he was fit for duty he needed "fairly intensive psychotherapy," and two psychologists found that he was fit for duty if he continued his therapy. (*Batka*, 186 Ill. App. 3d at 723.) "Where [as here] the administrative order is contrary to the manifest weight of the evidence, it is the duty of the reviewing court to affirm the action of the Circuit Court in setting it aside." (*Gloss v. Board of Trustees, Firemen's Pension Fund* (1971), 132 Ill. App. 2d 736, 738.)

Accordingly, we find that the circuit court was correct in reversing the Board's finding that Iwanski was not disabled as being against the manifest weight of the evidence.

## II

Iwanski contends on cross-appeal that the circuit court erred in finding that he was entitled to a non-duty rather than a duty-related disability pension. According to Iwanski, the evidence "demonstrates that [his] depression began after a duty[-]related back injury."

The evidence indicates that on December 5, 1985, Iwanski suffered a back injury while making an arrest, was treated and returned to work one month later. Because of the prolonged periods of sitting required by his job as a patrolman, he reaggravated the injury in February of 1986 and did not return to work until June of that year. He filed a claim with the Illinois Industrial Commission in connection with this injury and received a lump sum payment. Iwanski reaggravated the injury several times thereafter and filed an injury report in each case. According to Iwanski, he has experienced pain in his lower back, thighs and feet from the time of the initial injury forward. In addition, he claims that he has backed off of potentially confrontational situations because he was afraid of reinjuring his back, that his performance was down and that he became depressed because of the pain.

■ However, a significant amount of the evidence presented to the Board casts doubt on Iwanski's claim. For example, Dr. D'Agostino found that Iwanski's problems appeared to be an outgrowth of long-standing personality problems and that his symptoms were not caused by his having been a police officer. Similarly, although Dr. Rogers found that Iwanski's problems seemed to have been precipitated by what he perceived as the rejection of his efforts to please his supervisors at work, his frustration over their making his job more difficult than necessary and his return to the swing shift, the doctor concluded that his depressive disorder might well have occurred in any work requiring the flexibility of his police job. Although both of these doctors were aware of Iwanski's back injury, neither one cited it as the cause of his depression. Further, Dr. Rhead, who examined Iwanski at Iwanski's request, testified only that there was a "possibility" that Iwanski's back injury caused his depression. Similarly, in his report he stated that "one can say with certainty that the predisposing factors were present, but with much less certainty that the precipitating stress was that of his service with the police department."

198

A review of the evidence makes it clear that Iwanski failed to demonstrate that his mental disability was caused by the back injury he suffered while on duty; therefore, the circuit court did not err in finding that Iwanski was entitled to a non-duty rather than a duty-related disability pension.

For all of the above reasons, we affirm the judgment of the circuit court.

Affirmed.

DiVITO and McCORMICK, JJ., concur.