THIRD DIVISION 
 September 30, 1996
 
 











No. 1-94-0602 

THE COUNTY OF COOK, d/b/a ) Petition for Review 
Cermak Health Services, ) of an Order of the
 ) Illinois Local Labor
 Petitioner, ) Relations Board
 )
 v. ) No. L-CA-92-116
 )
LICENSED PRACTICAL NURSES ) 
ASSOCIATION OF ILLINOIS, ) 
DIVISION I, and ILLINOIS LOCAL ) 
LABOR RELATIONS BOARD, ) 
 )
 Respondents. )
 

 JUSTICE GREIMAN delivered the opinion of the court: 

 Petitioner County of Cook, d/b/a Cermak Health Services
(County), appeals the administrative decision of respondent
Illinois Local Labor Relations Board (Board) that found the
County had violated the Illinois Public Labor Relations Act (Act)
(5 ILCS 315/1 et seq. (West 1992)) by (1) unilaterally
implementing post-employment drug testing without collective
bargaining and (2) failing to sign the 1990-93 collective
bargaining agreement until seven months after the parties had
come to agreement. For all the reasons that follow, we affirm
the Board's decision. 

 On March 26, 1992, respondent Licensed Practical Nurses
Association of Illinois, Division I (LPNAI), filed an unfair
labor practice charge with the Board alleging that the County
engaged in unfair labor practices (1) by requiring two members of
LPNAI to submit to a drug test before being allowed to return to
work from medical leaves of absence and (2) by failing to execute
the new collective bargaining agreement. 
 As to the first charge, LPNAI alleged that on November 19,
1991, Bertha Farmer, an employee at Cermak Health Services, "was
required to submit to a drug screen before she was allowed to
return to work from a medical leave of absence." Similarly, on
January 6, 1992, Barbara Davis, another employee at Cermak Health
Services, was also required to submit to a drug test before
returning to work from a medical leave of absence. Neither
employee had any history of drug abuse or disciplinary problems
associated with substance abuse. 
 The charge also stated that during the fall of 1991, the
County and LPNAI entered negotiations for a new collective
bargaining agreement. During the course of negotiations, the
County proposed to include the following language: "The County
reserves the right to introduce pre-employment and post-
employment drug testing. Details of any such program shall be
discussed with the Union." The County, however, withdrew the
proposal on November 4, 1991, i.e., prior to the drug tests
imposed upon Bertha Farmer (November 19, 1991) and Barbara Davis
(January 6, 1992). 
 As to the second charge, LPNAI stated that a tentative
agreement was reached between the County and LPNAI on November
22, 1991. After the County drafted and sent to LPNAI a
memorandum of agreement, LPNAI signed the memorandum on December
20, 1991. LPNAI made several requests of the County to execute
the memorandum, but at the time of the filing of the complaint
(March 26, 1992), the County had failed to execute the written
agreement that had been negotiated and agreed upon by the
parties. The record reveals that the County did not sign the
agreement until July 7, 1992. 
 By its charge, LPNAI asked that the County be ordered to
cease and desist the drug testing of bargaining unit members
without cause and to execute the memorandum of agreement. 
 In its charge, LPNAI alleged unfair labor practices under
subsections 10(a)(1)and 10(a)(4) of the Act (5 ILCS 315/10(a)(1),
(a)(4) (West 1992)), which provide: 
 "(a) It shall be an unfair labor practice for an
 employer or its agents: 
 (1) to interfere with, restrain or coerce public
 employees in the exercise of the rights guaranteed
 in this Act or to dominate or interfere with the 
 formation, existence or administration of any
 labor organization or contribute financial or
 other support to it; provided, an employer shall
 not be prohibited from permitting employees to
 confer with him during working hours without loss
 of time or pay; 
 *** 
 (4) to refuse to bargain collectively in good
 faith with a labor organization which is the
 exclusive representative of public employees in an
 appropriate unit, including, but not limited to,
 the discussing of grievances with the exclusive
 representative." 
 Following an investigation, the Board issued a complaint for
hearing on January 8, 1993. The Board recited the allegations
made by LPNAI in its unfair labor practice charge, notified the
County to respond and announced that a hearing would be
conducted. In addition to the subsections on which LPNAI relied,
the Board, in its complaint for hearing, alleged that the County
violated subsection 10(a)(7) of the Act for its delay in signing
the collective bargaining agreement. Subsection 10(a)(7)
provides that it is an unfair labor practice for an employer 
 "(7) to refuse to reduce a collective bargaining
 agreement to writing or to refuse to sign such
 agreement." 5 ILCS 315/10(a)(7) (West 1992). 
 On May 11, 1993, a hearing was held before Sharon Wells, an
administrative law judge (ALJ). Three witnesses testified on
behalf of LPNAI: Sally Stix, counsel for LPNAI; Bertha Farmer and
Barbara Davis. The County presented three of its employees as
witnesses: Steven Klem, the assistant director of personnel and
later the deputy chief of the bureau of human resources; Helen
Maignon, a laboratory technician who performs drug screens; and
John Kalchbrenner, the deputy chief of human resources. 
 Both Bertha Farmer and Barbara Davis were employed at Cermak
Health Services, which is a health facility for detainees at the
Cook County jail and is located in a building within the County's
Department of Corrections complex. When employees of Cermak
Health Services enter the building, they must pass through
security and are searched for contraband and drugs. 
 Farmer was first employed at Cermak Health Services in
December 1981 and was required to submit a urine sample when she
was hired. After an extended medical leave from October until
mid-November 1991, Farmer went to the County building to be
processed to return to work in accordance with the policy for
employees who had been off work over five days. Prior to
resuming her job, Farmer was required to provide a urine specimen
in the presence of a security officer for purposes of drug
testing. No drug testing was required when Farmer returned to
work after four previous extended medical leaves of absence from
work in 1985 (July to December), 1986 (September to November),
1988 (June to July), and 1989 (August to December). Farmer
testified that she never had a substance abuse problem and had
never been in a substance abuse program. Moreover, Farmer had
never been accused of having a substance abuse problem and had
never been disciplined for having a substance abuse problem. 
 After working at the University of Illinois Hospital for 22
years, Barbara Davis became employed at Cermak Health Services in
March 1990. From October 2, 1991, until January 6, 1992, Davis
was on a leave of absence due to the death of her son. Upon
returning from leave, Davis was required to provide a urine
specimen for purposes of a drug screen test. Prior to her leave
commencing in October 1991, Davis had been absent from work about
two weeks and was not required to give a urine specimen to return
to work. Davis testified that she did not have a substance abuse
problem and had never been in a substance abuse program. Davis
had never been accused of having a substance abuse problem and
had never been disciplined for having a substance abuse problem. 
 Sally Stix was the chief spokesperson for LPNAI in the Cook
County negotiations during the summer and fall of 1991. During
these negotiations, the County proposed the following new clause:
"Drug Testing: The County reserves the right to introduce pre-
employment and post-employment drug testing. Details of any such
program shall be discussed with the Union." The parties never
discussed the substance of the proposal and the County withdrew
it on November 4, 1991. 
 On November 22, 1991, the final negotiating session, Farmer,
a member of the negotiating team for LPNAI, mentioned to Stix
that she had been required to submit a urine sample to return to
work. Stix, in turn, asked one of the County's negotiators, John
Kalchbrenner, about the drug test. Kalchbrenner said he did not
know and directed Stix to Steve Klem, who was not a member of the
negotiating team. Klem was the County's assistant director of
personnel at that time and later became the deputy chief of the
bureau of human resources. 
 Stix testified that during the final negotiations on 
November 22, 1991, she did not do anything else about Farmer's
incident because the County had already withdrawn its drug
testing proposal. Further, she intended to investigate whether
drug testing was being done contrary to the collective bargaining
agreement. Negotiations were concluding and she did not wish to
impede finalizing the agreement, which was already a year past
the expiration of the last agreement, before she had done an
investigation. Later, Stix requested and received from Klem a
copy of the County's policy regarding drug testing. 
 On behalf of the County, Steven Klem testified that in 1986
or 1987 he helped to write the drug testing policy enunciated in
a three-page written document entitled "Procedures For Using EMIT
Drug Detection System To Test Public Sector Job Applicants And
Employees For Drug Use In Cook County." The policy addressed
preemployment drug testing of job applicants and post-employment
testing only based on probable cause. The policy expressly
provides: 
 "B. Urine testing of employees will be conducted only
 under the following circumstances: 
 * When an employee has been identified by
 observation, absenteeism, health problems,
 accidents, or by other means, as having job
 performance problems that related to substance
 abuse. 
 * As part of a routine testing program of an
 employee returning to work with a history of
 illicit drug use or legal drug abuse. Such
 testing will not be used for the purpose of
 harassing or intimidating the employee. 
 * When an employee is found in possession of
 illicit drugs. 
 * As part of a routine urine testing program
 instituted as a result of prior disciplinary
 proceedings against the employee, related to the
 use or abuse of drugs." 
 In his testimony, Klem described the above policy regarding
employees as "probable cause and reasonable suspicion type
testing." Klem further testified that in mid-1990, a change in
policy was formulated for employees who had been absent for more
than 30 days for any cause. The "policy determination was made
by the chief elected official and the chief administrative
officer in the County of Cook at that time." The policy
requiring the drug testing of employees returning to work after
taking a leave more than 30 days was never written any place and
no notification of its implementation was provided to any labor
organizations. 
 Helene Maignon, a laboratory technician employed by the
County, has been collecting and testing the urine specimens for
drug testing since 1987 pursuant to the County's written policy
as to job applicants and employees where sufficient cause is
established to test them. Sometime in 1989 or 1990 or 1991, the
drug testing policy changed to include employees who went off the
payroll for 30 days. 
 John Kalchbrenner has been employed by the County as deputy
chief of human resources since December 1, 1992. Prior to his
current position, Kalchbrenner performed virtually the same
duties as the director of the position classification agency. 
Kalchbrenner negotiates with many labor unions. During 1991,
Kalchbrenner negotiated contracts with about 24 unions for the
1990-93 time period. Kalchbrenner and two members of his staff
worked on preparing all of the contracts. The agreement would be
drafted and then the draft would be submitted to the various
unions for review. Once the final draft was approved, signed and
returned from the union, the contract would be submitted to the
Board of Commissioners for their approval. The Board met twice a
month, i.e., the first and third Monday of each month. After
securing the Board's approval, the contract then would go to
president of the Cook County Board for his signature. 
Kalchbrenner estimated that the process took five or six months
into the year due to the volume and continuing negotiations with
other unions. 
 The collective bargaining agreement between the County and
LPNAI commenced December 1, 1987, and expired November 30, 1990. 
The 1987-90 agreement remained in effect pending negotiations for
a successor agreement and contained no language concerning post-
employment drug testing. The term of the successor agreement ran
from December 1, 1990, to November 30, 1993. 
 On September 8, 1993, the ALJ issued her recommended
decision and order. The ALJ found that the County had violated
the Act as alleged and specifically issued the following
conclusions of law: 
 "1. [The County] unilaterally implemented post-
 employment drug testing of members of the Unit,
 returning from leaves of greater than 30 days duration,
 without bargaining with [LPNAI] over the decision and
 the impact of the decision, in violation of Section[s]
 10(a)(4) and [(a)](1) of the Act. 
 2. [The County] refused to sign the collective
 bargaining agreement by failing to execute it for over
 seven months in violation of Section[s] 10(a)(7),
 10(a)(4), and 10(a)(1) of the Act." 
On October 27, 1993, the County filed with the Board exceptions
to the ALJ's recommended decision and order. 
 On January 19, 1994, the Board issued its decision and order
that upheld the ALJ's decision with one exception. The Board
found that the County did not violate section 10(a)(7) of the Act
because the County did not refuse to sign the collective
bargaining agreement. Instead, the seven-month delay in signing
the agreement constituted bargaining in bad faith and violated
sections 10(a)(1) and 10(a)(4) of the Act.
 On appeal the County first asserts that the drug testing
program is a matter of inherent managerial policy and, therefore,
is not a subject of mandatory collective bargaining under the
Act. In the alternative, the County contends that if this court
should find that the drug testing is a subject of mandatory
bargaining, the County's interest in drug testing outweighs
LPNAI's interest in bargaining. The County argues that drug
testing of employees who have been absent more than 30 days is
necessary because the County has not had the opportunity to
observe them for such length of time and has a legitimate
interest in knowing whether these employees have changed their
lifestyle in a manner that could breach the security and safety
of the jail. The County observes that LPNAI members come into
direct contact with inmates on a daily basis. 
 Judicial review of the Board's decision is governed by the
Administrative Review Law. 5 ILCS 315/9(i) (West 1992). 
Although our review extends to all questions of law and fact
presented by the entire record before the court, the findings and
conclusions of the Board on questions of fact must considered to
be prima facie true and correct. 735 ILCS 5/3-110 (West 1992). 
Our duty is not to reweigh the evidence but rather our function
is to ascertain whether or not the findings and conclusion are
against the manifest weight of the evidence. Iwanski v.
Streamwood Police Pension Board, 232 Ill. App. 3d 180, 184
(1992); Chief Judge of the Circuit Court v. American Federation
of State, County & Municipal Employees, Council 31, 229 Ill. App.
3d 180, 185 (1992). 
 When the issue on appeal is purely legal, such as statutory
construction, the interpretation given by the administrative
agency should receive deference because it flows from its
experience, but our review is de novo. Thomas M. Madden & Co. v.
Department of Revenue, 272 Ill. App. 3d 212, 215 (1995). 
Notwithstanding our independent review, we accord substantial
weight and deference to the interpretation of a statute by the
agency charged with the administration and enforcement of that
statute. Central City Education Ass'n, IEA/NEA v. Illinois
Educational Labor Relations Board, 149 Ill. 2d 496, 510 (1992); 
City of Decatur v. American Federation of State, County &
Municipal Employees, Local 268, 122 Ill. 2d 353, 361 (1988);
County of Cook v. Illinois Local Labor Relations Board, 266 Ill.
App. 3d 53, 57 (1994). Accordingly, an agency's interpretation
of a statute should only be overturned if it is clearly
erroneous. O'Hare-Midway Limousine Service, Inc. v. Baker, 232
Ill. App. 3d 108, 111 (1992). 
 Sections 7 and 4 of the Act govern the issue of mandatory
bargaining. Section 7 places a duty on a public employer "to
bargain collectively" and "to negotiate in good faith with
respect to wages, hours, and other conditions of employment, not
excluded by Section 4 of this Act." 5 ILCS 315/7 (West 1992).
 Section 4 provides that an employer "not be required to
bargain over matters of inherent managerial policy, which shall
include such areas of discretion or policy as the functions of
the employer, standards of services, its overall budget, the
organizational structure and selection of new employees,
examination techniques and direction of employees." 5 ILCS 315/4
(West 1992). Section 4 further provides that an employer must
"bargain collectively with regard to policy matters directly
affecting wages, hours and terms and conditions of employment as
well as the impact." 5 ILCS 315/4 (West 1992). 
 Where an issue affects both inherent managerial policy and
conditions of employment, a hybrid situation occurs and a
balancing test must be used to weigh "the benefits that
bargaining will have on the decisionmaking process with the
burdens that bargaining imposes on the employer's authority." 
Central City, 149 Ill. 2d at 523; see American Federation of
State, County & Municipal Employees v. Illinois State Labor
Relations Board, 274 Ill. App. 3d 327 (1995) (applying the
balancing test, the court held that a decision to lay off
employees was a mandatory subject of bargaining); Village of
Franklin Park v. Illinois State Labor Relations Board, 265 Ill.
App. 3d 997 (1994) (mandatory subjects of bargaining included
certain procedures and criteria for promotions). 
 To determine whether or not a given issue is a mandatory
subject of bargaining, the Illinois Supreme Court formulated a
three-part test in Central City: 
 "The first part of the test requires a 
 determination of whether the matter is one of
 wages, hours and terms and conditions of
 employment. This is a question that the
 IELRB is uniquely qualified to answer, given
 its experience and understanding of
 bargaining in education labor relations. If
 the answer to this question is no, the
 inquiry ends and the employer is under no
 duty to bargain. 
 If the answer to the first question is yes, then 
 the second question is asked: Is the matter
 also one of inherent managerial authority? 
 If the answer to the second question is no,
 then the analysis stops and the matter is a
 mandatory subject of bargaining. If the
 answer is yes, then the hybrid situation
 discussed in section 4 exists: the matter is
 within the inherent managerial authority of
 the employer and it also affects wages, hours
 and terms and conditions of employment. 
 At this point in the analysis, the IELRB should 
 balance the benefits that bargaining will
 have on the decisionmaking process with the
 burdens that bargaining imposes on the
 employer's authority. Which issues are
 mandatory, and which are not, will be very
 fact-specific questions, which the IELRB is
 eminently qualified to resolve." Central
 City, 149 Ill. 2d at 523. 
 As to the first part of the Central City test, the County
contends in its brief that its "drug testing policy does not
involve matters relating to employment under section 7 of the
Act." Such contention defies the record and logic. The
undisputed evidence reveals that unless an employee returning to
work from a leave of absence submits to a drug test, the employee
may not return to work and could be subject to discipline or
termination. It is difficult to imagine a more obvious condition
of employment. 
 Moreover, drug testing in employment has been recognized as
a condition of employment by the National Labor Relations Board. 
In state labor cases, the rulings of the National Labor Relations
Board (NLRB) are considered persuasive authority for similar
provisions in the state Act. American Federation of State,
County & Municipal Employees v. Illinois State Labor Relations
Board, 190 Ill. App. 3d 259, 264 (1989). The Office of General
Counsel for the National Labor Relations Board issued a
memorandum to address all cases involving drug and alcohol
testing and specifically advised as follows: 
 "In response to a growing national concern over 
 drug abuse and drugs in the workplace, some
 employers have decided to implement drug
 tests for their employees. In many drug
 testing programs, employees who refuse to
 submit to a test may be subject to
 discipline, including discharge, while
 employees who submit to the test and have
 positive results may be suspended and/or
 required to participate in rehabilitation
 programs, forced to accept a change in job
 duties, or subjected to discipline up to and
 including discharge. Thus, mandatory drug
 testing literally is a `condition of
 employment.'" Guideline Memorandum
 Concerning Drug or Alcohol Testing of
 Employees, GC-87-5, National Labor Relations
 Board, Office of General Counsel (September
 8, 1987). 
Thereafter, the NLRB has found that the unilateral implementation
by the employer of drug testing certain employees constituted
unfair labor practices. E.g., Kysor/Cadillac, 307 N.L.R.B. 598,
603 (1992) ("[b]y unilaterally implementing a policy and practice
of requiring certain unit employees to undergo drug testing as a
condition of employment, without prior notice to or affording the
Union an opportunity to bargain concerning such practice, and by
discharging [two employees] pursuant to such policy and practice,
the Company has engaged, and is engaging in unfair labor
practices"); Coastal Chemical Co., 304 N.L.R.B. 556, 568 (1991)
(by "unilaterally instituting and implementing a requirement that
employees who require treatment for job related injuries must
undergo a drug test the Company refused to bargain collectively
with the Union"). 
 The second part of the Central City test asks whether the
matter is also one of inherent managerial authority. Drug
testing policies can fall within the parameters of inherent
managerial authority as evidenced in the present case by certain
drug testing policies that are not in dispute. LPNAI has not
objected to the County's policies that require the drug testing
of job applicants and employees where there is probable cause or
a reasonable suspicion that the employee is using or abusing
drugs. Moreover, the Board observed that Cermak Health Services
is a part of the Cook County jail and recognized that the County
has the inherent managerial authority to institute rules and
regulations, such as drug testing of employees, to maintain
security within the jail by preventing drug trafficking and its
attendant problems. 
 We believe that both the Board and the ALJ properly advanced
to the third part of the Central City test to balance the
competing interests of the LPNAI members and the County to
determine whether the particular drug testing at issue here
should be subject to mandatory bargaining. Furthermore, we find
persuasive the Board's prior decision in City of Chicago (AFSCME
Council 31), 9 Pub. Employee Rep. (Ill.) par. 3001, Nos. L--CA--
91--088, L--CA--92--058 (November 24, 1992) which held that a
random drug testing policy unilaterally imposed by the City of
Chicago for certain civilian employees violated the Act and the
decision and the impact of the random drug testing policy are
mandatory subjects of bargaining. The dispute in City of Chicago
arose when the city unilaterally instituted random drug testing
of certain civilian employees of the Chicago police department
who were employed in the police department's crime laboratory and
evidence and recovered property section, where they performed
various duties in connection with the testing and storage of
criminal evidence, including narcotics. The city asserted that
the drug testing was necessary due to the employees' access to
drug samples in the course of their duties, which posed a threat
to the security and integrity of evidence essential to the
successful prosecution of crimes. 
 The Board acknowledged that the preservation of the
integrity of narcotics evidence is critical to the law
enforcement mission. The Board, however, found that no evidence
credibly linked the city's security concerns to its decision to
impose random drug testing on the employees. The Board observed
that the city made virtually no showing of drug use among such
employees, much less breaches of security or job performance. 
Not one instance was presented where such employee had been
accused of tampering with or removing drug samples. In addition,
the Board found that there was no indication that less intrusive
measures, including suspicion-based drug testing, were inadequate
to satisfy the city's concerns. 
 Similarly, in the present case, we agree with the Board's
findings that the County "failed to establish any link between
its policy of screening for drug use all licensed practical
nurses returning to work after leaves of more than 30 days, and
the security needs of the jail." In addition, there was no
evidence that nurses returning from leave of more than 30 days
ever tested positive, were more prone to the use of illegal
drugs, or exhibited security breaches or risks. Further, as in
City of Chicago, the County offered no explanation as to why the
suspicion-based drug testing, to which LPNAI acquiesced, did not
fulfill the needs of the County's mission to prevent drugs from
entering the facility. 
 The County next asserts that the delay in the ratification
of the agreement did not violate the Act because the County
diligently placed the agreement on the County Board's agenda and
LPNAI suffered no harm and no loss of benefits. 
 The Board held that the County's delay in executing the
1990-93 collective bargaining agreement was in bad faith and
thus, violated sections 10(a)(4) and 10(a)(1) of the Act because
the delay was extreme, no extenuating circumstances existed and
the County failed to contemporaneously explain the delay to
LPNAI. The Board found that the County's delay in executing the
agreement "caused confusion and uncertainty in the bargaining
unit." 
 In the present case, the County and LPNAI agreed to the
terms of the collective bargaining agreement on November 22,
1991. The County then drafted the agreement and sent it to
LPNAI, which signed and returned the agreement on December 20,
1991. On several subsequent occasions, LPNAI requested the
County to execute the agreement. In March 1992, LPNAI filed its
charge against the County and expressly alleged an unfair labor
practice because the County had still not signed the agreement. 
Notwithstanding LPNAI's requests and the charge filed by LPNAI in
March, the County did not sign the agreement until July 7, 1992,
approximately seven months after the terms of the agreement had
been decided and LPNAI signed the agreement. 
 Minor delays accompanied by extenuating circumstances do not
constitute unfair labor practices. See Chief Judge of the
Circuit Court of Cook County, 8 Pub. Employee Rep. (Ill.) par.
2044, No. S--CA--91--63 (ISLRB September 9, 1992); Cook County
Hospital, 4 Pub. Employee Rep. (Ill.) par. 3022, No. L--CA--88--
95 (ILLRB July 14, 1988). 
 The Board found the delay in the present case was extreme,
unexplained at the time, and caused confusion and uncertainty in
the bargaining unit. We agree with the Board's finding. 
 Affirmed. 
 TULLY, P.J., and GALLAGHER, J., concur.