FIRST DIVISION
December 14, 2009

No. 1-08-1426

KEITH DOOKERAN,                    )        Appeal from the
                                   )        Circuit Court of
        Plaintiff-Appellee         )        Cook County.
    and Cross-Appellant,           )
                                   )
        v.                         )        No. 06 CH 15376
                                   )
THE COUNTY OF COOK,                )
                                   )        The Honorable
        Defendant-Appellant        )        Kathleen M. Pantle,
    and Cross-Appellee.            )        Judge Presiding.

    JUSTICE GARCIA delivered the opinion of the court:

    This appeal and cross-appeal arise from Dr. Keith Dookeran's petition for review, through a common law writ of certiorari, of the Cook County Board's denial of his 2004 application for reappointment to the medical staff at John H. Stroger, Jr., Hospital of Cook County (Stroger). Dr. Dookeran was first hired by Stroger in 2000, subject to biennial reappointments. In his 2004 reappointment application, Dr. Dookeran revealed for the first time that he received a formal reprimand from his previous employer. Neither his initial 1999 application nor his 2002 reappointment application detailed the reprimand. Several administrative committees at Stroger conducted inquiries into the omission and discovered both the details of the previous reprimand and a series of allegations that Dr. Dookeran behaved

unprofessionally toward students, staff, and colleagues at Stroger. Pursuant to Stroger's medical staff bylaws (bylaws), a hearing committee was formed and heard testimony concerning the allegations against Dr. Dookeran.

Based on its findings, the hearing committee recommended that Dr. Dookeran's reappointment application be denied. Although other administrative committees disagreed, the Cook County Board adopted the hearing committee's recommendation and denied Dr. Dookeran's reappointment application. Dr. Dookeran filed a petition for a writ of certiorari in the circuit court. Judge Kathleen M. Pantle reversed the Board's denial of Dr. Dookeran's reappointment in favor of the reprimand recommended by Stroger's executive medical staff (EMS) to suspend Dr. Dookeran's clinical privileges for 30 days.

Cook County appeals, arguing that Judge Pantle failed to give due deference to the facts set out in the administrative record supporting the Board's denial of Dr. Dookeran's reappointment.

Dr. Dookeran cross-appeals from the 30-day suspension.

Because the Board's decision to deny reappointment was not arbitrary or capricious, we affirm the Board's decision and reverse Judge Pantle's order.

BACKGROUND

Dr. Dookeran's Employment History

2

In January 1997, Dr. Dookeran was hired at Mercy Hospital in Pittsburgh (Mercy) as a general surgeon and surgical oncologist. On November 18, 1998, Dr. Ronald Boron, chairman of the medical executive committee at Mercy, sent Dr. Dookeran a letter formally reprimanding him for "creat[ing] a hostile work environment." The letter requested that Dr. Dookeran "refrain from screaming and yelling at, berating, threatening and intimidating Mercy Hospital employees," and noted that "[f]urther outbursts and disruptive behavior of this type" would lead to "more serious action."  In the letter, Mercy's medical executive committee recommended that Dr. Dookeran "seek help in the form of counseling to assist in the control of this behavior."

Also in November 1998, Dr. Dookeran received a letter from the Greater Pittsburgh Surgical Associates (Greater Pittsburgh), a group practice at Mercy, terminating his position as director of surgical research and associate program director of the general surgery residency program.  According to the letter, the terminations were "a consequence of [Dr. Dookeran's] unprofessional conduct toward Mercy Hospital employees."

Applications and Appointments at Stroger

In 1999, Dr. Dookeran applied for a position in the surgery department at Stroger.  In his application, Dr. Dookeran noted that his contract with the Greater Pittsburgh practice group was

terminated in November 1998. Although the application form asked if Dr. Dookeran's clinical privileges had ever been revoked, it did not request information regarding formal reprimands; Dr. Dookeran's application did not disclose his reprimand letter from Mercy. Dr. Dookeran's application included a letter of recommendation from Dr. Howard Zaren, who supervised Dr. Dookeran at Mercy and in 1999 was chairman of Stroger's surgery department. Dr. Zaren would later testify before Stroger's hearing committee that he was aware of Dr. Dookeran's Mercy reprimand when he wrote the recommendation, but he believed the reprimand was "retaliation for a whistle blowing situation" wherein Dr. Dookeran allegedly discovered that doctors at the Mercy Cancer Institute forged their names on a grant application Dr. Dookeran prepared. In his recommendation, Dr. Zaren did not mention the reprimand letter and rated Dr. Dookeran's relationships with students, colleagues, and paramedical staff as exceptional. Based in part on Dr. Zaren's recommendation, Cook County appointed Dr. Dookeran to the Stroger medical staff as an attending physician with clinical privileges.

After his appointment, Dr. Dookeran was required by the bylaws to apply for reappointment biennially. In July 2002, Dr. Dookeran submitted an application for reappointment to his department chair, Dr. Zaren, who pursuant to the bylaws then

4

submitted it to Stroger's credentials committee. On the form, Dr. Dookeran indicated that he had not been reprimanded by any health care organization over the prior four years, failing to note Mercy's reprimand three years and eight months earlier. Dr. Dookeran was reappointed.

In April 2004, Dr. Dookeran again applied for reappointment by submitting the same form to Dr. Zaren and the credentials committee. However, on the 2004 application Dr. Dookeran fully disclosed the details of his Mercy reprimand, which by this point dated back nearly seven years.

Administrative Review at Stroger

The credentials committee requested in writing that Dr. Dookeran explain his failure to disclose Mercy's reprimand in either his 1999 job application or his 2002 reappointment application. In response, Dr. Dookeran wrote to the committee that the 1999 application form did not request information on reprimands, and that in July 2002 he "perhaps believed that the reprimand had occurred almost four years previously and that there was no need for reporting." Dr. Dookeran added, "[i]n my 2004 reapplication, I did not need to report the reprimand since it occurred 7 years ago, however, I did so in error." Subsequently, the credentials committee interviewed Dr. Dookeran and several other members of Stroger's staff to determine whether

his behavior at Stroger was similarly unprofessional as his conduct at Mercy.

Pursuant to the bylaws, the credentials committee submitted a recommendation to deny Dr. Dookeran's reappointment application to the executive medical staff (EMS). The bylaws provide that the EMS should review the credentials committee's recommendation and submit a recommendation of its own to the medical director and the joint conference committee, which advises the Cook County Board on its final decision. However, the bylaws permit an alternative path for review; any staff member can file a report with the peer review committee whenever the conduct of a practitioner threatens patient safety or falls below professional standards. Before making its recommendation to the medical director and joint conference committee, the EMS utilized this alternative and referred the matter to the peer review committee to investigate Dr. Dookeran's alleged misconduct at Stroger.[1]

---

[1] The record also reflects that the joint conference committee directly reviewed and adopted in full the credentials committee's recommendation to deny reappointment prior to receiving a final recommendation from the EMS. The bylaws do not provide for such review, and no action was taken by the Cook County Board until the joint conference committee received a

The peer review committee reviewed the credentials committee's report, met with members of the credentials committee, and interviewed Dr. Dookeran, Dr. Zaren, and several other members of Stroger's staff. The peer review committee then issued a written recommendation to the EMS. In its recommendation, the peer review committee concluded that Dr. Dookeran "willfully falsified" his 2002 reappointment application by denying the existence of the Mercy reprimand letter, and that Dr. Dookeran "has a long history of inappropriate behavior with hospital personnel" which "consists of verbal abuse." The committee also found that Dr. Dookeran "has not shown the ability or willingness to change his behavior." However, the peer review committee recommended only a 29-day suspension of Dr. Dookeran's clinical privileges.

The EMS reviewed the peer review committee's recommendation and adopted it, but increased the length of the suggested suspension to 30 days. This would require Dr. Dookeran to report the suspension to the national physician data bank and adversely affect his future employment prospects. The bylaws provide that when the EMS makes such an adverse recommendation against a

final recommendation from the EMS and voted again to deny reappointment.

7

practitioner, it triggers that practitioner's right to a "hearing and appeal" challenging that unfavorable decision before it is submitted to the joint conference committee. The bylaws further provided that at such a hearing, the practitioner "shall have the burden of proving, by clear and convincing evidence, that the adverse action or recommendation lacks a factual basis or that the adverse action or recommendation is arbitrary, capricious or unreasonable." At Dr. Dookeran's request, a hearing committee composed of five attending members of the medical staff not previously involved in the case was appointed to hear his appeal.

Testimony Before the Hearing Committee

The testimony before the hearing committee concerned Dr. Dookeran's reappointment applications and several allegations of unprofessional conduct by Dr. Dookeran at Stroger. Because the testimony was given at several different times based upon the availability of the relevant witnesses, we present it below according to its subject matter.

*Dr. Dookeran's Reappointment Applications*

In his testimony before the hearing committee, Dr. Dookeran admitted it was an error not to disclose his reprimand letter from Mercy on his 2002 reappointment application, but added that he "interpreted [the disclosure period] to be roughly four years." Dr. Dookeran testified that he received the reprimand

8

after the vice president of Mercy Cancer Institute solicited false complaints against him in retaliation for Dr. Dookeran "blowing the whistle" on a fraudulent application for a research grant from the National Cancer Institute.[2]  Dr. Zaren also testified that he believed Dr. Dookeran received his reprimand letter from Mercy "in retaliation" for reporting the allegedly fraudulent grant application.

*Incidents with Rush University*

Dr. Larry Goodman testified that in 2001 he was the dean of the Rush University Medical School.  In 2001, Rush medical students did surgery rotations at Stroger, where Dr. Dookeran was appointed student site coordinator.  Dr. Goodman testified that some of the students' written evaluations "described an environment *** that I thought was problematic."  Specifically, Dr. Goodman recalled that one student used the term "bullying" to describe Dr. Dookeran's treatment of students.  Dr. Goodman wrote a letter to Dr. Zaren indicating that he was assigning a new site

---

[2]  Dr. Dookeran filed a complaint against Mercy for retaliatory discharge under the whistleblower provision of the False Claims Amendments Act of 1986 (31 U.S.C. §3730(h) (2000)), which was dismissed.  See <u>Dookeran v. Mercy Hospital of Pittsburgh</u>, 281 F.3d 105 (3rd Cir. 2002).

coordinator and would not allow students to rotate in clinics or the operating room with Dr. Dookeran. Dr. Goodman never took similar actions with any other site coordinator.

Dr. Linnea Hauge, an assistant professor in the general surgery department at Rush, testified that she was also involved in the decision to remove Dr. Dookeran as site director. She testified that Rush students registered complaints against Dr. Dookeran for his "intimidating behaviors and inappropriate language," as well as "unprofessional interactions with students." Dr. Hauge also testified to unprofessional conduct by Dr. Dookeran directed at her. In 2000 she sought approval from Drs. Zaren and Dookeran to conduct a study at Stroger in her specialty, sports psychology. Drs. Zaren and Dookeran indicated that they would not approve the study unless it "[had] their name on it" as authors, although they did not intend to participate in the study as required for authorship credit under American Medical Association standards. Dr. Hauge testified that Dr. Dookeran "insulted and berated" her and never approved the study.

Dr. Zaren testified that Dr. Goodman's concern about Rush medical students' complaints was "strange" because Dr. Zaren had "seen *** similar evaluations in the past in every medical school relationship that [he was] involved in." Nonetheless, Dr. Zaren admitted that he "thought that [the complaints] were perhaps

10

troublesome." He agreed with Dr. Goodman that Dr. Dookeran should no longer have contact with Rush students and initiated sensitivity training at every level of the surgery department.

In response to the allegations of Drs. Goodman and Hauge, Dr. Dookeran testified that his position at Stroger required him to account for the costs and benefits of the Rush program, which led to tension with Rush administrators. He testified that their decision to remove him as Rush site coordinator and their testimony at the hearing were motivated by that conflict. Dr. Dookeran claimed that Dr. Hauge was lying when she testified that he and Dr. Zaren refused to approve her study unless they were credited as co-authors.

*Chicago Medical School Incidents*

Dr. Lecia Apantaku testified that she is the director of undergraduate education for the department of surgery at the Chicago Medical School (CMS) and oversees the surgical education of students, including their surgical rotations at Stroger. In 2001, Dr. Dookeran was internal coordinator for CMS students at Stroger. Dr. Apantaku testified that some of the students complained of being "berated publicly" by Dr. Dookeran. In February 2004, Dr. Apantaku called Dr. Dookeran to address the complaints. Dr. Dookeran claimed that those who registered complaints were poor students, then Dr, Dookeran resigned as the

11

internal coordinator. Dr. Apantaku testified that after Dr. Dookeran's resignation, she received a letter from a student, Roderick Hart, in which he claimed that Dr. Dookeran "unjustly criticized [him] in public in a very unprofessional manner." Because Dr. Dookeran had already resigned his position with CMS, she did not pursue the matter.

In response to the allegations of misconduct toward CMS students, Dr. Dookeran testified that Dr. Apantaku never contacted him about complaints from students. He testified that he resigned as site coordinator "because it was too much work."

Dr. Zaren testified that he met with Roderick Hart. Dr. Zaren was "perplexed" by Hart's complaints of racial discrimination because both Hart and Dr. Dookeran are black. Nonetheless, he told Hart that he could change Hart's rotation. Dr. Zaren also testified that all students complain when they receive negative evaluations.

*Relationship with Dr. Robert Walter*

Dr. Robert Walter testified that prior to 2003 he was a scientific officer in the department of surgery at Stroger. His primary duties were to run a laboratory and conduct a research program. In 2002, Dr. Dookeran became Dr. Walter's supervisor. In 2003, Dr. Dookeran began requiring Dr. Walter to use a time clock to prove his attendance at the hospital because Dr.

Dookeran repeatedly had difficulty locating Dr. Walter during work hours. Dr. Walter testified that to his knowledge no other scientific officers at Stroger are required to use a time clock.

In January 2003, Dr. Walter attended a meeting with Drs. Zaren and Dookeran at which Dr. Dookeran asked Dr. Walter to explain how the department of surgery benefitted from the various "collaborative projects" Dr. Walter conducted with doctors in other departments and at other institutions. According to Dr. Walter's testimony, Dr. Dookeran asked how the department of surgery would be "paid back" for his time, and at one point suggested that "one of the ways the Department [of surgery] could be compensated is if these people that I was collaborating with were to pay *** for instance, to a Hektoen [bank] account. They could pay a monetary amount and then he said possibly to my Hektoen account." Dr. Walter testified that he was "stunned," and subsequently he wrote a memo to Drs. Dookeran and Zaren asking for clarification. In response, Dr. Dookeran called Dr. Walter into his office, "then just started to rage *** and have a tirade about this memo" for 10 to 15 minutes. Dr. Walter testified that Dr. Dookeran began "shouting down at me and calling me a liar."

Dr. Zaren testified that Dr. Walter's testimony about the January 2003 meeting was "[a]bsolutely untrue." He also

13

testified that Dr. Walter refused to follow the rules and regulations that Dr. Zaren established for him, and that any timekeeping requirements Dr. Dookeran imposed were at Dr. Zaren's behest. Dr. Zaren testified that Dr. Walter was subsequently transferred to the trauma burn department.

Dr. Dookeran testified that Dr. Walter was an unhelpful employee that refused to aid Drs. Dookeran and Zaren in developing a cancer center at Stroger. He testified that "a lot" of Dr. Walter's testimony did not "adequately represent what happened."

Erica Radeke, an administrator that worked with Dr. Dookeran, testified that she shared an office with Dr. Dookeran and was present when Dr. Dookeran called Dr. Walter into the office to discuss his memo. Radeke testified that Dr. Dookeran was not threatening and did not call Dr. Walter a liar. She added that it was "public knowledge" that Dr. Dookeran was "a little bit deaf," which often caused him to talk louder than most people.

*Conduct Toward Dr. Gabriela Oana*

Dr. John Greager, chairman of surgical oncology at Stroger, testified that in 2004 he received a letter from another student, Dr. Gabriela Oana, claiming that "Dr. Dookeran [did not act] in what was conceived as a professional manner" when he paged her

14

repeatedly during surgery and yelled at her. Dr. Greager wrote a memo to the associate chairwoman of education at Stroger requesting that Dr. Oana be reappointed in future rotations. Dr. Greager also testified that "a number of incidences [were] reported to myself and others regarding a similar kind of scenario."

Nurse Luth Mendoza testified on Dr. Dookeran's behalf about the alleged incident in 2004 involving Dr. Oana. She testified that she was asked by Dr. Dookeran to page Dr. Oana repeatedly to join him in surgery, but Dr. Oana did not respond. When she later saw Dr. Oana in surgery with Dr. Dookeran, she did not see Dr. Dookeran yell at or threaten Dr. Oana. Nurse Alfredo Lazo also testified that he was in the operating room at the time of the incident and that Dr. Dookeran did not yell at Dr. Oana.

Dr. Dookeran testified that a number of the complaints against him "have to do with Dr. Greager and people concerned with Dr. Greager," but suggested that these complaints were made in retaliation for "an altercation" between Dr. Greager and Dr. Dookeran's staff.

*Other Incidents With Stroger Staff*

Nurses Lori Supol and Adelina Jonson each testified that on May 10, 2004, Dr. Dookeran walked outside an operating room during a surgical procedure and started "yelling" for fixative

15

that should have been kept stocked in the room.  Nurse Jonson also read the statements of technician Joven Visperas and nurse Myung Kim into evidence, each of which confirmed the incident. Physician's assistant Wendy Rogowski testified that she was assisting Dr. Dookeran during the procedure on May 10, 2004.  She testified that Dr. Dookeran left the room and stated that fixative "was needed now in a firmness," but his actions were appropriate for the case because fixative was needed immediately to complete a surgical procedure on a patient.

Nurse Celine Drwiega testified that on two occasions she was subjected to Dr. Dookeran's "verbal abuse and bullying."  In the first instance, she was assisting Dr. Dookeran on a breast biopsy.  She removed a clamp from a tissue sample, accidentally dislodging a wire necessary to handle the sample.  Nurse Drwiega testified that Dr. Dookeran repeatedly shouted "you are the most incompetent nurse, why did you remove that [clamp]?"

On another occasion, Nurse Drwiega was assigned to prepare a room for a surgery Dr. Dookeran was to perform.  When Dr. Dookeran arrived, an instrument requested by the anesthesiologist was being sterilized elsewhere and, thus, the room was not ready. Dr. Dookeran "became angry and shouted loudly at me 'you are ignorant and I'm not the only one that thinks so.' "  He also called nurse Drwiega incompetent.

Susanne Klein, Stroger's director of quality assurance, testified that during a training session for the Illinois Department of Public Health's survey staff in 2004, a surveyor observed Dr. Dookeran become angry during a surgery. The surveyor said that Dr. Dookeran was "very unhappy with the staff in the room." Klein testified that this was the only time in her 15 years as director of quality assurance that a surveyor had brought a surgeon's behavior to her attention.

*Peer Review Committee Testimony*

Dr. Jay Mayefsky, the chairman of the peer review committee, testified that during the peer review committee's interview with Dr. Dookeran, he asked Dr. Dookeran two questions in quick succession. Dr. Dookeran "exploded in fury, accusing [Dr. Mayefsky] of not being courteous to him and was really, really angry." Dr. Robert Kern, another member of the peer review committee, also testified before the hearing committee. According to Dr. Kern's testimony, Dr. Dookeran did not "explode" at Dr. Mayefsky, but only became "somewhat defensive." Dr. Kern testified that he would react similarly in a "tense situation."

*Character Witnesses*

Dr. Dookeran called several witnesses to testify to his professional character. Drs. Caroline Lopez, Karen Ferrer, and Marin Sekosan each testified that they saw Dr. Dookeran work with

17

other staff members and students, and they had not seen him act unprofessionally nor had they heard any complaints about Dr. Dookeran's behavior.

## Hearing Committee Recommendation

After considering the above testimony, the hearing committee submitted written findings to the EMS president in accordance with the bylaws. The hearing committee found that Dr. Dookeran failed to provide "clear and convincing evidence *** that he did not willfully falsify his 2002 reappointment application," and did not "provide convincing evidence that he did not display abusive or unprofessional behavior toward the several people presented at this hearing." The committee lamented that "[w]ith absolutely no insight into his problem with anger management, one cannot expect that it will ever change." Dr. Dookeran "failed *** to successfully challenge the credibility of the evidence," and thus the hearing committee concluded that "the Credential Committee's recommendation [to deny reappointment] is based on fact and is not arbitrary, capricious or unreasonable." Choosing from six possible sanctions listed in the bylaws, the hearing committee recommended to the EMS the most severe: suspension or revocation of Dr. Dookeran's staff membership.

## Final Action and Circuit Court Review

In accordance with the bylaws, the EMS reviewed the hearing

18

committee's recommendation and made a recommendation of its own to the medical director and joint conference committee. The EMS again recommended a 30-day suspension of Dr. Dookeran's clinical privileges. However, the joint conference committee voted to adopt the hearing committee's position and revoke Dr. Dookeran's staff membership. The joint conference committee forwarded that recommendation to the Cook County Board for final action; on June 20, 2006, the Cook County Board adopted that recommendation and denied Dr. Dookeran's reappointment application, thereby terminating his employment at Stroger.

Dr. Dookeran filed a petition for a common law writ of certiorari in circuit court seeking review of the Cook County Board's action. On January 30, 2008, Judge Pantle issued an order in which she found that "there is ample evidence to support factual findings about a pattern of verbally abusive and inappropriate behavior on the part of Dr. Dookeran [and] that he failed to disclose [his Mercy reprimand] on his application for reappointment in 2002." However, Judge Pantle expressed concern with the hearing committee's recommendation, noting that it "contains no analysis of how the hearing committee came to [its] conclusion, and why lesser sanctions are inappropriate." Finding that the recommendation of the hearing committee, later adopted by the joint conference committee, "is not supported by the

19

facts," Judge Pantle "vacated" the denial of reappointment and "remanded to the hearing committee to recommend a lesser sanction."

Cook County filed a motion for reconsideration. On April 30, 2008, Judge Pantle denied the motion, noting that the joint conference committee's "lack of any reasoning, coupled with the imposition of a burden on Dr. Dookeran to prove that the allegations did not occur (a burden which is contrary to well-established principles of law), warrant the conclusion that there is no competent evidence of record which supports the sanction imposed." However, Judge Pantle granted Cook County's motion for modification of the April 30, 2008, judgment; on May 16, 2008, Judge Pantle entered an order remanding to the Cook County Board to enter an order suspending Dr. Dookeran's clinical privileges for 30 days as recommended by the EMS. Judge Pantle noted that the May 16, 2008, order was final and appealable. Cook County timely appealed, and Dr. Dookeran timely cross-appealed.

ANALYSIS

Standard of Review

"A common law writ of certiorari is a general method for obtaining court review of administrative actions when the act conferring power on the agency does not expressly adopt the Administrative Review Law [citation], and provides for no other

form of review." Lapp v. Village of Winnetka, 359 Ill. App. 3d 152, 166, 833 N.E.2d 983 (2005), citing Dubin v. Personnel Board, 128 Ill. 2d 490, 497-99, 539 N.E.2d 1243 (1989). The standard of review of a writ of *certiorari* is identical to that under the Administrative Review Law (735 ILCS 5/3-101 et seq. (West 2006)). Lapp, 359 Ill. App. 3d at 166.

In administrative review cases, we review the decision of the administrative agency, not the decision of the circuit court. Gaston v. CHAC, Inc., 375 Ill. App. 3d 16, 22, 872 N.E.2d 38 (2007), citing Ahmad v. Board of Education, 365 Ill. App. 3d 155, 162, 847 N.E.2d 810 (2006). Our review of an administrative agency's discharge of an employee proceeds in two stages: first we determine if the agency's findings of fact are contrary to the manifest weight of the evidence; then we decide whether "the agency's factual findings provide a sufficient basis for concluding 'cause' for discharge exists." Applegate v. Department of Transportation, 335 Ill. App. 3d 1056, 1062, 783 N.E.2d 96 (2002), citing Grames v. Illinois State Police, 254 Ill. App. 3d 191, 204-05, 625 N.E.2d 945 (1993).

At the first stage, we take the administrative agency's factual findings as prima facie true and correct; we will not reverse those findings unless they are against the manifest weight of the evidence. Gaston, 375 Ill. App. 3d at 22-23,

21

citing Ahmad, 365 Ill. App. 3d at 162. On factual questions, we review the administrator or committee that "acts as a fact finder, hearing testimony, determining the credibility of witnesses and drawing reasonable inferences from the evidence" (Gaston, 375 Ill. App. 3d at 23, citing Ahmad, 365 Ill. App. 3d at 162); in this case, the hearing committee played that role.

At the second stage, we will overturn "a public hospital's rejection of an application for staff membership *** [only] if the rejection was arbitrary, capricious or unreasonable." Evers v. Edward Hospital Ass'n, 247 Ill. App. 3d 717, 729, 617 N.E.2d 1211 (1993), citing Mauer v. Highland Park Hospital Foundation, 90 Ill. App. 2d 409, 413, 232 N.E.2d 776 (1967).

### Hearing Committee's Factual Findings

In its appeal, Cook County contends that the denial of Dr. Dookeran's reappointment application is not arbitrary or unreasonable, but is properly based upon the factual findings of the hearing committee, which Judge Pantle did not overturn. Thus, Cook County's appeal concerns only the second stage of review. See Applegate, 335 Ill. App. 3d at 1062, citing Grames, 254 Ill. App. 3d at 204-05. However, in his cross-appeal, Dr. Dookeran challenges nearly all of the hearing committee's factual findings, arguing that they are contrary to the manifest weight of the evidence and, thus, cannot support any adverse action.

Because Dr. Dookeran's claims on cross-appeal address the hearing committee's factual findings, properly the subject of the first stage of our review, it is appropriate we address those claims first.

At the outset, we note Judge Pantle's concern that Dr. Dookeran bore the burden at the hearing to present clear and convincing evidence that the EMS lacked a factual basis to take the recommended adverse action. That the evidentiary burden falls on Dr. Dookeran is clearly set forth in the bylaws describing the hearing and appeal procedure. The hearing and appeal procedure was only triggered after the adverse recommendation was issued against Dr. Dookeran. We note that Dr. Dookeran does not challenge the validity of the bylaws that he bears the burden of challenging the factual basis for the adverse action. Where the bylaws themselves are not challenged, our review is limited to ensuring that the bylaws are duly followed. See, e.g., Goldberg v. Rush University Medical Center, 371 Ill. App. 3d 597, 602, 863 N.E.2d 829 (2007) (review of a hospital's dismissal is limited to whether the hospital complied with its bylaws). Further, we note that Illinois courts have consistently held that "a plaintiff to an administrative proceeding holds the burden of proof, and relief will be denied if he or she fails to sustain that burden." Miller v. Hill, 337 Ill. App. 3d 210, 216,

785 N.E.2d 532 (2003), citing <u>Iwanski v. Streamwood Police Pension Board</u>, 232 Ill. App. 3d 180, 184, 596 N.E.2d 691 (1992). A clear-and-convincing-evidence burden is placed upon plaintiffs to administrative hearings in other contexts, such as a taxpayer contesting an assessment (<u>United Airlines, Inc. v. Pappas</u>, 348 Ill. App. 3d 563, 569, 809 N.E.2d 735 (2004)) or a driver petitioning for a restricted driving permit after a DUI-related license revocation (<u>Cisneros v. White</u>, 337 Ill. App. 3d 93, 103, 785 N.E.2d 99 (2003)). We do not share Judge Pantle's concern with Dr. Dookeran's burden at the "hearing and appeal" as provided by the bylaws to challenge the findings of the hearing committee.

Dr. Dookeran first contends the hearing committee's finding that he willfully falsified his 2002 reappointment application is contrary to the manifest weight of the evidence. Dr. Dookeran points to Dr. Zaren's knowledge of the Mercy reprimand as evidence that he did not intentionally omit the information. We disagree. Dr. Zaren's awareness of Dr. Dookeran's Mercy reprimand is irrelevant; the 2002 reappointment application made clear that "omission of information may be grounds for rejection or termination." Dr. Dookeran admitted before the hearing committee that he indicated that he had not been reprimanded by any health care organization over the prior four years in his

2002 application. His later disclosure of the Mercy reprimand on his 2004 reappointment application did not absolve his 2002 omission. Dr. Dookeran's assertion that he "interpreted [the disclosure period] to be roughly four years" does not explain the omission of the reprimand that fell within the four-year time period. The 2002 reappointment form's language is clear: Dr. Dookeran was required to disclose the Mercy reprimand because it was issued less than four years prior. Nor was disclosing his termination from the Greater Pittsburgh practice group in his 1999 application for the position at Stroger equivalent to disclosing the reprimand he received from Mercy itself. We find no evidence to undermine the hearing committee's finding that Dr. Dookeran willfully falsified his 2002 reappointment application.

Next, Dr. Dookeran challenges the hearing committee's finding that he behaved unprofessionally toward Rush medical students and administrators. Dr. Goodman provided testimony about the nature of student evaluations he received from Rush students concerning Dr. Dookeran and recalled specifically one student referring to Dr. Dookeran's conduct as "bullying." Dr. Goodman removed Dr. Dookeran as student coordinator for Rush medical students, an action he had never taken with another student coordinator in 15 years. The hearing committee specifically found Dr. Goodman's testimony credible. Dr.

25

Goodman's testimony was reinforced by Dr. Hauge's testimony that Rush students complained that Dr. Dookeran acted unprofessionally in the course of instructing them.

Dr. Dookeran argues that this testimony is hearsay and therefore cannot constitute evidence of specific instances of misconduct, an assertion he repeats throughout his challenges to the various factual findings by the hearing committee. The bylaws, however, make clear that the hearing committee is not required to adhere to "strict rules of evidence" and that "[a]ny relevant matter upon which responsible persons customarily rely in the conduct of serious affairs [may] be admitted regardless of the admissibility of such evidence in a court of law." Dr. Dookeran does not contend that testimony attributed to the Rush medical students was not admissible under the bylaws. See Pulido v. St. Joseph Memorial Hospital, 191 Ill. App. 3d 694, 701-02, 547 N.E.2d 1383 (1989) (admission of testimony that was arguably hearsay at a suspension hearing did not violate an identical bylaw concerning admission of evidence). The testimony from Drs. Goodman and Hauge demonstrated a pattern of student complaints against Dr. Dookeran. Contrary to Dr. Dookeran's argument, the hearing committee was under no obligation to credit his explanation that the complaints were the result of a economic concerns he raised regarding the Rush program, which Drs. Goodman

26

and Hauge both favored, and that his removal was precipitated by that conflict. The hearing committee was free to rely upon the testimony of Drs. Goodman and Hauge to support its finding that Dr. Dookeran "failed to provide clear and convincing evidence that he did not act unprofessionally toward medical students from Rush." See Gaston, 375 Ill. App. 3d at 23, citing Ahmad, 365 Ill. App. 3d at 162.

We are also unpersuaded by the challenge to Dr. Hauge's testimony that Dr. Dookeran "insulted and berated" her when she declined to add Dr. Dookeran and Dr. Zaren as co-authors of a study she sought approval for, which the two declined to give. Although Drs. Dookeran and Zaren testified that they did not make any inappropriate requests, the hearing committee was free to resolve this conflict in testimony in favor of Dr. Hauge. Gaston, 375 Ill. App. 3d at 23, citing Ahmad, 365 Ill. App. 3d at 162. Further, Dr. Dookeran provided no evidence contradicting Dr. Hauge's testimony that he later berated her in a telephone call about her study. Absent conflicting testimony, the hearing committee was free to credit Dr. Hauge's testimony that Dr. Dookeran berated her as another example of Dr. Dookeran's unprofessional behavior.

Dr. Dookeran next challenges the committee's finding that he acted unprofessionally toward CMS medical students, which the

27

committee found was not overcome by clear and convincing evidence.  Dr. Dookeran essentially argues that the hearing committee should have taken as true his testimony that he resigned his position as a CMS internal coordinator because it required too much work and his testimony that Dr. Apantaku never contacted him about a series of complaints from students concerning his unprofessional behavior.  Again, it was for the committee to decide which of the conflicting versions it found credible and, once again, the committee found against the version offered by Dr. Dookeran.  Gaston, 375 Ill. App. 3d at 23, citing Ahmad, 365 Ill. App. 3d at 162.  Dr. Apantaku testified that several students complained that Dr. Dookeran publicly berated them, and when she called Dr. Dookeran to discuss the complaints, he resigned.  She specifically recalled an incident where Dr. Dookeran called her and wanted a student removed because "the student wasn't wearing an appropriately clean white coat."  Dr. Dookeran's argument that the letter written by Roderick Hart was explained away by a negative evaluation he received from Dr. Dookeran does not discredit the remaining evidence supporting the hearing committee's conclusion that Dr. Dookeran acted unprofessionally in his role as CMS's internal coordinator.

Next, Dr. Dookeran contends he overcame by clear and convincing evidence the committee's finding that he displayed

28

"abusive and unprofessional behavior" on May 10, 2004, in yelling for fixative outside an operating room. In this instance, Dr. Dookeran's position is well taken. While nurses Supol and Jonson each testified that Dr. Dookeran started "yelling" for fixative, physician's assistant Wendy Rogowski testified only that Dr. Dookeran said that fixative "was needed now in a firmness." None of the testimony indicated that Dr. Dookeran used inappropriate language or berated any specific person. He wanted fixative, which should have been stocked in the operating room, quickly in order to properly complete a procedure on a patient. The manifest weight of the evidence does not support that Dr. Dookeran acted unprofessionally in what two witnesses characterized as "yelling" but another witness described as "firmness," for fixative to finish surgery for his patient's comfort and safety. However, this questionable finding does little to undercut the evidence demonstrating a pattern of unprofessional behavior on other occasions.

The next issue Dr. Dookeran raises concerns Dr. Walter's allegations. Dr. Dookeran attempts to justify the timekeeping requirements he placed on Dr. Walter, ignoring the testimony that no such requirements have ever been placed upon scientific officers at Stroger. Dr. Dookeran repeatedly asks us to credit his witnesses over Dr. Walter. He again presents Dr. Zaren's

29

testimony that Dr. Walter fabricated his testimony that Dr. Dookeran requested contributions to his personal bank account. He also emphasizes administrator Radeke's testimony that Dr. Dookeran did not go on a "tirade" about the memo Dr. Walter wrote asking for clarification of Dr. Dookeran's personal contribution request. Once again, we decline Dr. Dookeran's implied invitation that we substitute our assessment of the evidence for the hearing committee's assessment that Dr. Walter's testimony credibly demonstrated that Dr. Dookeran behaved unprofessionally. Gaston, 375 Ill. App. 3d at 23, citing Ahmad, 365 Ill. App. 3d at 162.

Dr. Dookeran next disputes the hearing committee's finding that clear and convincing evidence was not marshaled to overcome the finding that Dr. Dookeran acted in an abusive and unprofessional manner toward Dr. Oana. Dr. Dookeran's argument again highlights the conflict in the evidence. He relies on the testimony of two nurses that did not see him yell at Dr. Oana when she did not respond to repeated pages asking her to join him in surgery. However, Dr. Oana's letter indicated that Dr. Dookeran acted unprofessionally. That Dr. Oana was still willing to work with Dr. Dookeran following the incident does not prove that the incident never occurred. Dr. Dookeran's reliance upon a memo from Dr. Bass, who investigated the incident nearly a month

30

later, is misplaced; the memo does not absolve Dr. Dookeran of wrongdoing, but merely acknowledges that Dr. Oana and the two nurses had different perceptions of the incident and that more official channels of investigation, outlined in the bylaws and utilized in this case, are required to resolve such conflicts in perception. Further, Dr. Dookeran offers no challenge to Dr. Greager's testimony that he received reports of several other incidents of Dr. Dookeran's unprofessional behavior; it appears Dr. Dookeran has abandoned his trial testimony that the complaints were made in retaliation for an alleged altercation between Dr. Greager and Dr. Dookeran's staff. We find no basis to overturn these findings by the hearing committee.

Finally, Dr. Dookeran challenges the hearing committee's reliance upon Dr. Mayefsky's testimony that Dr. Dookeran "exploded in fury" during his interview with the peer review committee, pointing to Dr. Kern's conflicting testimony that Dr. Dookeran only became "somewhat defensive." Once again, the hearing committee was free to resolve this conflict in the evidence by crediting Dr. Mayefsky's testimony. Gaston, 375 Ill. App. 3d at 23, citing Ahmad, 365 Ill. App. 3d at 162.

We note that neither during the hearing nor on appeal has Dr. Dookeran challenged the testimony of nurse Celine Drwiega that on two specific occasions she was subjected to Dr.

31

Dookeran's "verbal abuse and bullying." Dr. Dookeran also does not attempt to explain the testimony of Stroger's director of quality assurance, Susanne Klein, who testified that an Illinois Department of Public Health surveyor reported his unprofessional behavior during a surgery in 2004.

Based on our review of the record, the evidence presented at the hearing supported a finding that Dr. Dookeran engaged in a pattern of "abusive or unprofessional behavior," separate and apart from his failure to disclose the Mercy reprimand on his 2002 reappointment application.

### Denial of Reappointment

We now turn to the second stage of our inquiry: whether the facts provided the Cook County Board with a sufficient basis for Dr. Dookeran's discharge. Applegate, 335 Ill. App. 3d at 1062, citing Grames, 254 Ill. App. 3d at 204-05.

Cook County contends that the denial of Dr. Dookeran's reappointment application should be sustained in light of the highly deferential standard of review, providing for reversal only if the decision is arbitrary or unreasonable. Dr. Dookeran responds that Cook County committed a due process violation by denying his reappointment based on what he characterizes as an accidental omission in his previous reappointment application regarding the Mercy reprimand and unreliable evidence that he

32

engaged in abusive and unprofessional behavior at Stroger, which he contends, even if true, does not demonstrate that his behavior in any way affected patient care.  On cross-appeal, he argues that the competent evidence was insufficient to support any suspension of his clinical privileges, an argument rejected by every reviewing committee at Stroger and by the circuit court below.

The Cook County Board's denial of reappointment as a sanction for Dr. Dookeran's omission of the Mercy reprimand on his 2002 reappointment application and his unprofessional conduct while at Stoger is subject to reversal only if it was arbitrary or unreasonable.  Applegate, 335 Ill. App. 3d at 1062, citing Merrifield v. Illinois State Police Merit Board, 294 Ill. App. 3d 520, 530, 691 N.E.2d 191 (1998); Evers, 247 Ill. App. 3d at 729, citing Mauer, 90 Ill. App. 2d at 413.  "The proper test is not whether the reviewing court would have imposed a lesser sanction if it were making the decision in the first place, but whether, in view of the circumstances, the agency acted unreasonably or arbitrarily in rendering its decision."  Hickey v. Riera, 332 Ill. App. 3d 532, 547-48, 774 N.E.2d 1 (2001), citing Edwards v. Illinois Racing Board, 187 Ill. App. 3d 287, 293, 543 N.E.2d 172 (1989).

Reviewing courts defer to an administrative agency's

33

"expertise and experience" in determining the appropriateness of sanctions. Ulysse v. Lumpkin, 335 Ill. App. 3d 886, 893, 781 N.E.2d 415 (2002), citing Abrahamson v. Illinois Department of Professional Regulation, 153 Ill. 2d 76, 99, 606 N.E.2d 1111 (1992). Illinois courts have traditionally refused to review staffing decisions at private hospitals with only limited exceptions. Goldberg, 371 Ill. App. 3d at 601-02. " ' "The judicial reluctance to review these internal staff decisions reflects the unwillingness of courts to substitute their judgment for that of hospital officials with superior qualifications to consider and decide such issues." ' " Goldberg, 371 Ill. App. 3d at 602, quoting Garibaldi v. Applebaum, 194 Ill. 2d 438, 452, 742 N.E.2d 279 (2000), quoting Adkins v. Sarah Bush Lincoln Health Center, 129 Ill. 2d 497, 507, 544 N.E.2d 733 (1989).

The parties dispute whether Dr. Dookeran had a property or liberty interest in his 2004 reappointment so as to trigger due process protection. We find no reason to resolve the dispute because, as Dr. Dookeran readily admits, the denial of his reappointment application raises due process concerns only when the decision is shown to be arbitrary or capricious, the same standard applied to hospital staffing decisions in Illinois. Evers, 247 Ill. App. 3d at 729, citing Mauer, 90 Ill. App. 2d at 413. Because the standard is identical, it follows that if we

34

find the Cook County Board's action is not arbitrary or capricious, Dr. Dookeran's due process claim also fails. See Lapidot v. Memorial Medical Center, 144 Ill. App. 3d 141, 494 N.E.2d 838 (1986)

Lapidot, upon which Cook County relies, is instructive. In that case, the plaintiff's medical staff privileges were revoked after the defendant hospital discovered that in his application, the plaintiff falsely stated that his privileges had never been suspended, diminished, or revoked at another hospital. Lapidot, 144 Ill. App. 3d at 142. The application form specifically stated that "any significant misstatements and/or admissions from this application constitute cause for summary dismissal." Lapidot, 144 Ill. App. 3d at 150. The court noted that "false answers on applications for employment have repeatedly been considered proper grounds for dismissal in various other contexts." Lapidot, 144 Ill. App. 3d at 151, citing Munoz v. Civil Service Comm'n, 32 Ill. App. 3d 1052, 337 N.E.2d 344 (1975), Roundtree v. Board of Review, 4 Ill. App. 3d 695, 281 N.E.2d 360 (1972), Price v. Civil Service Board, 123 Ill. App. 2d 2, 259 N.E.2d 613 (1970). The court held that in the context of medical services providers, false answers also constituted proper grounds for dismissal. Accordingly, the hospital "was within its rights in terminating staff privileges for what it considered to

35

be a material misrepresentation." Lapidot, 144 Ill. App. 3d at 150.

Dr. Dookeran's reappointment application contained nearly identical language to the application form in Lapidot--"omission of information may be grounds for rejection or termination." In Lapidot, the doctor's failure to provide the required information on the application was deemed a denial of the existence of past sanctions. Lapidot, 144 Ill. App. 3d at 142. In the instant case, Dr. Dookeran was found to have "willfully falsified" his 2002 reappointment application in failing to disclose the Mercy reprimand. In an attempt to avoid the application of the holding in Lapidot to his situation, Dr. Dookeran stresses that in Lapidot there were also allegations of improper patient care against the physician. Lapidot, 144 Ill. App. 3d at 150-51. That there were additional grounds to find against the plaintiff in Lapidot provides no basis to place Dr. Dookeran beyond the holding in Lapidot.

The hearing committee's factual findings make clear that Dr. Dookeran engaged in abusive and unprofessional conduct in his interactions with students, colleagues, and staff at Stroger. Even if we were to find a basis to question these findings, which we do not, the Lapidot court made clear that a material misrepresentation on an application alone can support a dismissal

36

or, in this case, the rejection of Dr. Dookeran's reappointment application.  Lapidot, 144 Ill. App. 3d at 151.

Dr. Dookeran argues that omission of the Mercy reprimand from his 2002 reappointment application was de minimus, especially in light of his later disclosure of that information in 2004.  He further contends that his alleged unprofessional behavior, even if it occurred, did not jeopardize patient care and thus did not warrant sanctions.

We first point out that, even if Dr. Dookeran's actions did not directly affect patient care, the bylaws provide that corrective action against a practitioner is appropriate when either patient care is endangered or the practitioner's behavior is "lower than the ethical or other professional standards of the medical community."  As noted above, the evidence presented at the hearing was more than sufficient to support the conclusion that Dr. Dookeran berated and often acted in a bullying manner with various members of the Stroger community, behavior that could properly be considered unprofessional and worthy of sanctions.  Thus, Dr. Dookeran's argument on cross-appeal that no sanction of any sort was justified is simply not supported by the record.

Further, we find no basis to question the Cook County Board's decision to deny reappointment.  See Applegate, 335 Ill.

App. 3d at 1062. It is true that suspension or revocation of Dr. Dookeran's staff membership was the most severe sanction the bylaws permitted the hearing committee to recommend. However, the variation between the recommendations of the peer review committee, the EMS, and the hearing committee demonstrates the difficulty of determining the appropriate sanction even amongst experienced practitioners in the medical field. Given that difficulty, it is unclear how judicial intrusion into the Cook County Board's final decision can be justified given our lack of medical expertise or knowledge of the subtleties that might warrant one sanction over another. Ulysse, 335 Ill. App. 3d at 893, citing Abrahamson, 153 Ill. 2d at 99; Goldberg, 371 Ill. App. 3d at 602, citing Garibaldi, 194 Ill. 2d at 452, citing Adkins, 129 Ill. 2d at 507. The wiser course, in a case where there was ample evidence that Dr. Dookeran's professional conduct warranted a sanction, is to uphold the sanction the Cook County Board has determined is both reasonable and within the bylaws of Stroger hospital.

We reverse Judge Pantle's order and uphold the denial of Dr. Dookeran's 2004 reappointment application, thereby terminating his employment at Stroger.

CONCLUSION

A series of investigations by various administrative

38

committees at Stroger hospital revealed that Dr. Dookeran falsified his 2002 reappointment application by failing to disclose an official reprimand from his previous employer and that Dr. Dookeran was involved in a series of incidents of abusive and unprofessional behavior. The testimony introduced before the Stroger hearing committee was more than sufficient to demonstrate the falsification and the improper conduct engaged in by Dr. Dookeran. Based upon the findings of fact issued by the hearing committee, the Cook County Board's decision to deny Dr. Dookeran's 2004 reappointment application was not arbitrary or capricious. We uphold the Cook County Board's considered judgment.

Circuit court reversed; Board affirmed.

PATTI and LAMPKIN, JJ., concur.

1-08-1426

_____

KEITH DOOKERAN,

Plaintiff-Appellee
and Cross-Appellant,

v.

THE COUNTY OF COOK,

Defendant-Appellant
and Cross-Appellee.

_____

No. 1-08-1426

**Appellate Court of Illinois**
**First District, First Division**

**Filed: December 14, 2009**

_____

**JUSTICE GARCIA delivered the opinion of the court.**

**PATTI and LAMPKIN, JJ., concur.**

_____

**Appeal from the Circuit Court of Cook County**
**Honorable Kathleen M. Pantle, Judge Presiding**

_____

**For PLAINTIFF-**      **Jabob Pomeranz, Esq.**
**APPELLEE AND**      **Cornfield and Feldman**
**CROSS-APPELLANT**      **25 East Washington Street, Suite 1400**
                     **Chicago, Illinois, 60602-1803**

**For DEFENDANT-**      **Patrick T. Driscoll, Jr., Chief, Civil Action Bureau**
**APPELLANT AND**      **Arleen C. Anderson,**

1-08-1426

**CROSS-APPELLEE**       **RICHARD A. DEVINE, State's Attorney, Cook County**
      **500 Richard J. Daley Center**
      **Chicago, Illinois   60602**